# Exhibit A

3/7/2022 10:49

# CITATION –TRC 99 and 106

THE STATE OF TEXAS

COUNTY OF DENTON

**CAUSE NO. 22-1776-481**

**TO: Colynda Williams-Arowolo, 1868 Newport Terrace, San Pedro, CA 90732 (or wherever he/she may be found)**

Notice to defendant: You have been sued. You may employ an attorney. If you, or your attorney, do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the first Monday following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may also be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

| | |
|---|---|
| Court: | 481st Judicial District Court<br>1450 E. McKinney, 4th Floor, Denton, TX 76209 |
| Cause No.: | 22-1776-481 |
| Date of Filing: | March 04, 2022 |
| Document: | Plaintiff's Original Petition |
| Parties in Suit: | T2 Modus, LLC; Colynda Williams-Arowolo |
| Clerk: | David Trantham, District Clerk, 1450 E. McKinney, Suite 1200, Denton, TX 76209 |
| Party or Party's Attorney: | William Finegan<br>500 N. Akard St., Suite 3800, Dallas, Texas 75201 |

Issued under my hand and seal of this said court on this the 7th day of March, 2022.

David Trantham, District Clerk
Denton, Denton County, Texas

BY: ______________________
David Trantham, District Clerk

## Service Return

Came to hand on the _______ day of _____________, 20___ , at ______m., and executed on the ______ day of _______________, 20___, at ______ M by delivering to the within named _________________________ in person a true copy of this citation, with attached copy(ies) of the Plaintiff's Original Petition, at ________________ _____________________________________________.

Service Fee: $ ____________

___________________________ Sheriff/Constable
___________________________ County, Texas

Service ID No. _______________

___________________________
Deputy/Authorized Person

## VERIFICATION

On this day personally appeared ____________________________________________ known to me to be the person whose name is subscribed on the foregoing instrument and who has stated: upon penalty of perjury, I attest that the foregoing instrument has been executed by me in this cause pursuant to the Texas Rules of Civil Procedure. I am over the age of eighteen years and I am not a party to or interested in the outcome of this suit, and have been authorized by the Denton County Courts to serve process.

Subscribed and sworn to before me on this the ________ day of _________________________, 20__

______________________ Notary Public

FILED: 3/7/2022 11:01 AM
David Trantham
Denton County District Clerk
By: David Trantham, Deputy

22-1776-481
**CAUSE NO. ________________**

| | | |
|---|---|---|
| **T2 MODUS, LLC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | **DENTON COUNTY, TEXAS** |
| **COLYNDA WILLIAMS-AROWOLO,** | § | |
| | § | |
| **Defendant.** | § | **____ JUDICIAL DISTRICT** |

**PLAINTIFF'S ORIGINAL PETITION**

Plaintiff T2 Modus, LLC ("*T2*" or "*Plaintiff*") files their Original Petition against Colynda Williams-Arowolo ("*CWA*" or "*Defendant*") and would show the Court as follows:

## I.
## DISCOVERY CONTROL PLAN

1. T2 intends to conduct discovery under Level 3 of the Texas Rules of Civil Procedure and affirmatively pleads that this suit is not governed by the expedited actions process in Texas Rule of Civil Procedure 169.

## II.
## RULE 47 STATEMENT

2. Plaintiff seeks monetary relief over $250,000 but not more than $1,000,000 and non-monetary relief.

## III.
## PARTIES

3. Plaintiff T2 Modus, LLC is a Texas limited liability company with its principal office at 905 Shadow Ridge Drive, Highland Village, Texas 75077.

4. Defendant Colynda Williams-Arowolo is an individual domiciled in California. Defendant Colynda Williams-Arowolo may be served with process at her residence at 1868 Newport Terrace, San Pedro, CA 90732, or wherever she may be found.

## IV.
## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over CWA because CWA has committed unlawful acts which are the subject of this lawsuit in Texas.

6. Further, the Court has subject matter jurisdiction over this case because this suit involves state law claims, and the amount in controversy, exclusive of interest and costs, is within the jurisdictional limits of this Court.

7. Venue is proper in Denton County, as a substantial part of the events giving rise to Plaintiff's claims occurred in Denton County. TEX. CIV. PRAC. & REM. CODE 15.002(3).

## V.
## FACTUAL BACKGROUND

### A. T2's business and the DPPA.

8. T2 is a data intelligence and software solution company that operates in the automotive dealership industry. T2 expended significant resources to develop a sophisticated data mining software[1] that permits car dealerships to maintain and update certain information about its clients (i.e. vehicle owners). In the automotive industry, maintaining up-to-date personal information about vehicle owners is important for a variety of reasons. For example, car dealerships frequently send information about a vehicle owners' car warranty or to inform the vehicle owner about a potential recall on their vehicle. In addition, car dealerships can use personal information about its clients and consumers to predict and identify those consumers who are the most likely to be in the market to purchase a new vehicle or who may need vehicle services.

---

[1] T2 has applied for a patent for this software and is awaiting a decision on whether the software is patentable. T2 has also copyrighted and trademarked its software product.

9. Access to vehicle owners' personal information is heavily regulated through a federal statute called the Driver's Privacy Protect Act (the "*DPPA*"). The DPPA protects certain information about an individual including, among other protected information, the individual's social security number, name, driver's license number, address, and telephone numbers. Under the DPPA, these types of protected information can only be obtained or disclosed under enumerated permissible uses outlined in the statute. There are significant civil penalties (and potential criminal penalties) associated with violations of the DPPA.

10. Compliance with all the requirements of the DPPA is a high priority for T2. In connection with developing its software product for car dealerships, T2 obtained multiple advanced certifications and developed relationships with vendors to ensure that the data T2's software provided to its customers (i.e. car dealerships) is pristine. In addition, T2 developed and implemented internal controls and monitoring to ensure that it is adhering to DPPA-compliance policies. Employees of T2, including CWA, are routinely trained in the appropriate DPPA compliance methods.

11. The product developed by T2 provides assurance for car dealership that the data it has for its customers is updated, accurate, and obtained/maintained in compliance with the DPPA regulations. In addition, T2's product includes certain artificial intelligence and predictive analytics components that are useful to car dealerships to help them understand their customer base and identify potential needs.

12. Once a car dealership enters an agreement with T2, T2 grants the car dealership a license for its software in exchange for payments. T2 software is designed to capture personal information about vehicle owners (i.e the dealership's customers) from the car dealership's Client Relationship Management ("*CRM*") system. T2 then, through its various sources and

using its unique credentials, verifies, supplements, and returns information about the identified vehicle owners to the car dealership. In addition, the information provided to car dealerships about the vehicle owners is over-laid and enhanced with T2's artificial intelligence and predictive analytics thus creating an entirely unique product for the car dealership. Through its software license, the car dealerships can access and manipulate this product to fit its business needs.

13. T2's business is highly competitive. To succeed in the industry, as discussed above, T2 has developed a substantial amount of confidential, proprietary, and trade secret information that gives it an advantage over its competitors. Among T2's most valuable assets are its employees, customers, vendor, data sources and its ability to deliver clean and up-to-date data about vehicle consumers that complies with all DPPA regulations. T2's employees are required to use T2's confidential, proprietary, and trade secret information to perform their jobs and, as such, are the custodians and guardians of that information. In addition, T2 employees are extensively trained in the appropriate compliance and security methods associated with the highly regulated DPPA information and data. For T2 to prosper, it must obtain and maintain the trust of its customers, *especially with regard to maintaining the integrity of the DPPA data it collects and organizes for its customers*. Confidential, proprietary, and trade secret information relating to T2's customers provides T2 with an advantage over its competitors, particularly given its ongoing relationships with such customers and its knowledge of customer needs and preferences.

**B. CWA's employment with T2**

14. CWA began working with T2 in December 2019 as the Vice President of Training and Education. On or around, May 1, 2021 CWA was promoted to Executive Vice

President of Customer Excellence & Engagement ("*EVP*"). In her role as EVP, CWA managed the company's relationships with their customers, which included the following job duties:

- Train car dealership clients on the use T2's search engine function within its software platform;
- Consult with car dealership clients on client needs and specific campaign needs to maximize the dealerships potential profits;
- Ensure that the car dealership clients is familiar with and aware of the value of the T2 software capabilities and how to
- Working to maintain strong relationships with car dealerships to prevent cancellation of services; and
- Presenting and discussing T2's products and services with car dealership professionals; educating the car dealership professionals about the benefits of T2's products.

15. In addition, T2 provided CWA with a wide latitude to work with T2 vendors and data sources so that CWA could accomplish her job duties and optimize results for T2.

16. While employed by T2, CWA had access to information that T2 regards and treats as highly confidential and proprietary, including but not limited to information regarding T2's customers and prospective customers; the identities of such customers and prospective customers; contact information for such customers and prospective customers; customer orders, desires and preferences; business plans and projections; and marketing plans and strategies. In addition, CWA had access to the identity of the various vendors and data sources that T2 utilizes in connection with producing its proprietary software. CWA had full knowledge of these sources and relationships and, throughout her employment with T2, CWA communicated regularly with these vendors and data sources. This information is sufficiently confidential and

sensitive that, if someone were to use it in competition with T2, it would put T2 at a competitive disadvantage, or it would cause T2 to lose the competitive advantage that the confidential and proprietary information provided. In addition, CWA had access to highly regulated and protected DPPA information about each customer's clients.

17. In the course of her employment with T2, on January 6, 2020, CWA entered into an agreement entitled General Non-Disclosure Agreement (the "*Non-Disclosure Agreement*"), which contains certain confidentiality requirements.[2] CAW agreed, that both during and after her employment with T2 and for a period of five years following any disclosure of confidential information, she would "protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as [she] uses to protect its own confidential information of a like nature."[3] She further agreed that upon termination or at T2's request she would promptly return all Confidential Information and all copies, notes, summaries, or extracts thereof or certify destruction of the same.[4]

18. These contractual obligations explicitly survive the termination of CWA's employment.[5]

## C. CWA's separation from T2 and CWA's wrongful use and access of T2's computer systems

19. On December 13, 2021 at 7:43 PM, CWA unexpectedly and suddenly resigned from T2 and notified T2 that December 13, 2021 would be her last day of employment.

20. CWA did not provide T2 with any information about her new employer. T2 later learned that CWA accepted employment with The AutoMiner, LLC ("*AutoMiner*"), a company

---

[2] A true and correct copy of the Non-Disclosure Agreement is attached hereto as Exhibit A.
[3] Ex. A, § 3.
[4] Ex. A, § 5.
[5] Ex. A, § 5.

that is also provides data mining platforms for car dealerships. According to its website, AutoMiner is the "industry-leading, clean customer data platform" that provides "managed marketing services designed exclusively for dealers." AutoMiner is a direct competitor with T2.

21. In the weeks leading to CWA's resignation from T2 and the months following CWA's resignation, a number of T2's customers cancelled their existing contracts with T2. As the VP of Training and Education, CWA had a close relationship with many of the dealerships that canceled their contracts with T2. In fact, through its contacts at various dealerships, T2 learned that CWA was actively soliciting T2 customers on behalf of AutoMiner and informing these customers that AutoMiner was able to provide the same services as T2 at half the cost.

22. Freeman Honda, a Honda dealership located in Dallas, Texas, was one of the dealerships that attempted to cancel its contract with T2 following CWA's resignation. On or around January 1, 2022, Freeman Honda provided a cancelation notice to T2 indicating that it would no longer be using T2's software products. Freeman Honda's cancelation notice was especially surprising to T2 because the cancelation notice came less than fourteen days after the Freeman Honda informed T2, on a call with the CEO of T2 and CWA, that Freeman Honda would commit to a one year extension in exchange for an upgrade to T2's latest product release.

23. However, on January 6, 2022, after it purportedly canceled its services with T2, Honda Freeman's account was used to login to T2's secure software program and download over 2,500 secure and confidential records relating to Honda Freeman's customers that were stored and hosted on T2's computer systems. The records that were downloaded not only included confidential, private and protected information about the customers of Freeman Honda, but also included T2's confidential and proprietary artificial intelligence and predictive analysis.

24. After learning of Honda Freeman's unauthorized access, T2 conducted an investigation to determine what information was accessed and who accessed the information on behalf of Honda Freeman. In conducting this investigation, T2 learned that the IP address associated with the computer/internet that was used to sign into Honda Freeman's account with T2 was not located in Dallas, Texas (where Honda Freeman is located and where previous logins were made), but rather originated from an IP address in California.

25. This unusual activity alarmed T2 and upon further investigation, T2 determined that the IP address used to access the Honda Freeman account on January 6, 2022 was identical to the IP address associated with the computer/internet that CWA used while she was employed by T2. Based on its investigation and, on information and belief, T2 believes that CWA, nearly a month after her resignation from T2, logged into Honda Freeman's T2 account and downloaded over 2,500 secure and confidential records containing not only confidential, private and protected information about Freeman Honda's customers, but also T2's confidential and proprietary trade secret information. There is no conceivable reason why CWA would need to or be authorized to access this data.

## VI.
## CAUSES OF ACTION

### A. COUNT 1 – Violation of Computer Fraud and Abuse Act

26. T2 incorporates by reference and re-alleges the paragraphs above as if fully set forth herein.

27. Without T2's consent or authorization, and/or by exceeding any authorized access, CWA: (i) intentionally or knowingly accessed a protected computer and/or computer system used in interstate commerce, with the intent to defraud obtained valuable information in excess of $5,000 in value; and (ii) intentionally accessed a protected computer and/or computer

system without authorization and as a result of such conduct recklessly and otherwise caused damage by unlawfully accessing the confidential information therein.

28. This conduct constitutes violations of the federal Computer Fraud and Abuse Act, 18 USC Section 1830, and gives rise to civil and criminal liability. Accordingly, T2 seeks to sue CWA pursuant to 18 USC Section 1030(g) to recover compensatory and economic damages caused by CWA's unlawful conduct.

**B. COUNT 2—Violation of the Texas Harmful Access to Computer Act**

29. T2 incorporates by reference and re-alleges the paragraphs above as if fully set forth herein.

30. Following her separation from T2, on December 13, 2021, CWA knowingly accessed utilized Honda Freeman's account information to login to T2's computer network and/or computer systems without the consent of T2. Through her improper access to T2's computer network and/or computer systems, CWA downloaded T2's confidential and proprietary information and information about Honda Freeman's customers.

31. CWA's illegal access of T2's computer network and/or computer systems violated Section 33.02(a) of the Texas Penal Code and Section 143.001(a) of the Texas Civil Practices and Remedies Code.

32. T2 was harmed by CWA's improper access of T2's computer network and/or computer systems and the downloading of T2's and Freeman Honda's confidential and proprietary information.

33. The actions described above have caused actual and consequential damages to T2 in an amount to be determined by the Court. T2 has been and continues to be damaged by CWA's actions and conduct in an amount that cannot be presently determined.

## C. COUNT 3 – Statutory Misappropriation of Trade Secrets (Texas Uniform Trade Secrets Act)

34. T2 incorporates by reference and re-alleges the paragraphs above as if fully set forth herein.

35. T2 owns confidential, proprietary and trade secret information relating to its services and business practices, including but not limited to the identities of T2's customers and confidential and proprietary information concerning those customers.

36. The above-described confidential and proprietary information constitutes protectable trade secrets under the Texas Uniform Trade Secrets Act ("*TUTSA*") because such information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use, and such information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. See TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(6).

37. T2 engages in reasonable efforts to ensure that its confidential and proprietary information remains secret by, among other things, requiring its employees (including CWA) to execute confidentiality agreements before receiving or having access to such information, by requiring its employees to review and comply with the and by limiting access to only the employees who have a strict need to know the information based on their job responsibilities.

38. CWA misappropriated the trade secrets embodied in T2's confidential and proprietary information. Specifically: (i) CWA used the trade secrets without the express or implied consent of T2, in the manner described above; and (ii) at the time of such use, CWA knew or had reason to know her knowledge of the trade secrets was acquired under

circumstances giving rise to a duty to maintain the secrecy of, or limit the use of, the trade secrets. *See id.* at § 134A.002(3).

39. The actions described above have caused actual and consequential damages to T2 in an amount to be determined by the Court. T2 has been and continues to be damaged by CWA's actions and conduct in an amount that cannot be presently determined.

40. Additionally, because CWA's misappropriation of T2's trade secrets was willful and malicious, T2 seeks exemplary damages for such misappropriation. *See id.* at § 134A.004(b).

### D. COUNT 4—Breach of Contract (Non-Disclosure Agreement)

41. T2 incorporates by reference and re-alleges the paragraphs above as if fully set forth herein.

42. The Non-Disclosure Agreement is a valid and enforceable contract between T2 and CWA.

43. T2 fully performed its obligations under the Non-Disclosure Agreement and all conditions precedent have occurred or, in the alternative, have been waived.

44. In the Non-Disclosure Agreement, CWA agreed that "protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as [she] uses to protect its own confidential information of a like nature."[6]

45. CWA breached the Non-Disclosure Agreement by, among other things, using and accessing T2's confidential and proprietary information on behalf of herself and/or Freeman Honda, without T2's authorization, as described herein.

---

[6] Ex. A, § 3.

46. As a direct and proximate result of CWA's breach of the Non-Disclosure Agreement, T2 has suffered and will continue to suffer immediate and irreparable injury, the exact extent, nature, and amount of which is currently impossible to ascertain, and for which there is no adequate remedy at law.

**E. COUNT 5—Breach of Fiduciary Duty of Confidentiality**

47. T2 incorporates by reference and re-alleges the paragraphs above as if fully set forth herein.

48. T2 placed significant trust in CWA during her employment. CWA received information and know-how regarding T2's confidential and proprietary services and business practices. CWA also received access to some of T2's most significant, valuable and closely guarded assets: the identities of T2's customers, vendors, data sources and confidential and proprietary information concerning those customers (including the services they utilize and their unique desires and preferences). CWA was trusted to protect T2's business interests and to safeguard its confidential and proprietary information. For these reasons, and because she was an employee of T2 CWA was, whether formally or informally, a fiduciary to T2. CWA was, therefore, required to act in the best of good faith with respect to T2, to strictly comply with the confidentiality and Non-Disclosure agreements between CWA and T2, and to refrain from using T2's confidential and proprietary information for any reason whatsoever following her separation from employment with T2. In short, CWA owed a fiduciary duty of confidentiality to T2.

49. As shown above, following her separation from T2, CWA engaged in conduct that was directly contrary to T2's interests, including but not limited to her use of T2's confidential and proprietary information for the benefit of herself and/or Freeman Honda.

CWA's use of T2's confidential and proprietary information is evidenced by her access of the T2 database in January 2021. CWA's conduct as described herein amounts to a breach of her fiduciary duties of confidentiality to T2.

50. CWA's breach of her fiduciary duty to T2 has proximately caused actual and consequential damages to T2 in an amount to be determined by the fact finder. T2 has suffered and will continue to suffer immediate and irreparable injury, the exact extent, nature, and amount of which is currently impossible to ascertain, and for which there is no adequate remedy at law.

**F. Attorneys' Fees and Costs**

51. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, Section 134A.005(3) of the Texas Civil Practice and Remedies Code, T2 is entitled to and hereby seeks its reasonable attorneys' fees, costs and expenses in prosecuting this action.

## VII.
## PRAYER

WHEREFORE, Plaintiff T2 Modus, LLC. respectfully requests judgment in their favor and against Defendant Colynda Williams-Arowolo as follows:

(a) Defendant be cited to appear and answer;

(b) Actual damages, including direct and consequential damages;

(c) Special damages;

(d) Exemplary and/or punitive damages;

(e) Pre-judgment and post-judgment interest as allowed by applicable law;

(f) Reasonable and necessary attorneys' fees and court costs; and

(g) Such other and further relief to which Plaintiff is justly entitled .

**DATE:** March 4, 2022

Respectfully submitted,

*/s/ William Finegan*
William Finegan
Texas Bar No. 07008700
Aynsley Young
Texas Bar No. 24102674
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard St., Suite 3800
Dallas, Texas 75201
Telephone: 214.855.7500
Facsimile: 214.855.7584
Email: bfinegan@munsch.com
Email: ayoung@munsch.com

ATTORNEYS FOR PLAINTIFF
T2 MODUS, LLC

# General Non-Disclosure Agreement

This General Non-Disclosure Agreement ("Agreement") is entered into as of the date of last signature below (the "Effective Date") between T2 Modus, LLC and its affiliated entities, with an address at 2712 Highgrove Ct., Colleyville, Texas 76034 ("T2"), and the individual or entity identified below ("Participant"). In order to protect certain confidential information, which may be disclosed between T2 and Participant, the parties agree to the following:

1. Definition. "Confidential Information" means the non-public information that is exchanged between the parties, provided that such information is: (i) identified as confidential at the time of disclosure by the disclosing party (the "Discloser"), or (ii) disclosed under circumstances that would indicate to a reasonable person that the information ought to be treated as confidential by the party receiving such information (the "Recipient").

2. Purpose. The Recipient may use the Confidential Information solely for the purpose of (the "Purpose"):

T2: BRAD NICHOLS

Participant: ______________________

If the above "Purpose" section of this Agreement is not filled in for a party, such party may use the Confidential Information that it receives from the other party for the general purpose of: (i) reviewing and facilitating a potential business relationship, and/or (ii) performance of activities related to the conduct of a business relationship between the parties.

3. Protection of Confidential Information. For a period of five (5) years following the applicable date of disclosure of any Confidential Information, a Recipient shall hold the Confidential Information in confidence and not disclose the Confidential Information to any third party. A Recipient shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipient uses to protect its own confidential information of a like nature. The Recipient may disclose the Confidential Information to its agents and independent contractors with a need to know in order to fulfill the Purpose who have signed a nondisclosure agreement at least as protective of the Discloser's rights as this Agreement

4. Exclusions. This Agreement imposes no obligation upon a Recipient with respect to Confidential Information which: (i) is or becomes public knowledge through no fault of the Recipient; (ii) was in the Recipient's possession before receipt from the Discloser and was not subject to a duty of confidentiality; (iii) is rightfully received by the Recipient without any duty of confidentiality; (iv) is disclosed generally to a third party by the Discloser without a duty of confidentiality on the third party; or (v) is independently developed by the Recipient without use of the Confidential Information. The Recipient may disclose the Discloser's Confidential Information as required by law or court order provided: (i) the Recipient promptly notifies the Discloser in writing of the requirement for disclosure; and (ii) discloses only as much of the Confidential Information as is required.

5. Term. This Agreement shall continue from the Effective Date until terminated. Either party may terminate the Agreement at any time by giving ten (10) days written notice of its intent to terminate this Agreement. The Recipient's obligations with respect to the Confidential Information hereunder shall survive any termination of the Agreement. Upon request from the Discloser or upon termination of the Agreement, the Recipient shall return all Confidential Information and all copies, notes, summaries or extracts thereof or certify destruction of the same.

6. Proprietary Rights. Each party shall retain all right, title and interest to such party's Confidential Information. Neither party to this Agreement acquires any patent, copyright or other intellectual property rights or any other rights or licenses under this Agreement except the limited right to use set out in Section 2 ("Purpose") above.

7. Injunctive Relief. The parties acknowledge that a violation of the Recipient's obligations with respect to Confidential Information would cause irreparable harm to the Discloser for which a remedy at law would be inadequate. Therefore, in addition to any and all remedies available at law, Discloser shall be entitled to an injunction or other equitable remedies in all legal proceedings in the event of any threatened or actual violation of any or all of the provisions hereof.

8. Independent Development. Nothing in this Agreement shall be construed to preclude either party from developing, using, marketing, licensing, and/or selling any product or service that is developed without use of the Confidential Information.

9. No Warranty. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING THE CONFIDENTIAL INFORMATION, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR ACCURACY.

10. Export Administration. Each party to this Agreement agrees to comply fully with all relevant export laws and regulations of the United States and any other applicable jurisdiction to assure that no Confidential Information or any portion thereof is exported, directly or indirectly, in violation of such law.

11. General. The parties do not intend that any agency or partnership relationship be created between them by this Agreement. This Agreement sets forth the entire agreement with respect to the Confidential Information disclosed herein and supersedes all prior or contemporaneous agreements concerning such Confidential Information, whether written or oral. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Neither party shall assign this Agreement (whether by operation of law, sale of securities or assets, merger or otherwise) or any rights or obligations hereunder without the other party's prior written consent. All additions or modifications to this Agreement must be made in writing and must be signed by an authorized officer of both parties. Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. Any waiver to be effective must be in writing signed by an authorized officer of the waiving party. If any provision of this Agreement shall be held, for any reason, to be illegal, invalid or non enforceable, the remaining provisions shall nonetheless be legal, valid and enforceable. This Agreement and all matters arising out of or relating to this Agreement shall be governed by the laws of the State of California, without regard to its conflict of laws rules.

| T2 MODUS L.L.C. | | PARTICIPANT: | |
|---|---|---|---|
| By: Brad Nichols | Date: 1/6/20 | By: [signature] | Date: |
| Name: Brad Nichols | | Name: | |
| Title: Executive VP Operations | | Title: | |



EXHIBIT A

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Priscilla Beesley on behalf of Bill Finegan
Bar No. 7008700
pbeesley@munsch.com
Envelope ID: 62306741
Status as of 3/7/2022 9:30 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Priscilla Beesley | | pbeesley@munsch.com | 3/4/2022 11:54:15 AM | SENT |
| Bill Finegan | | bfinegan@munsch.com | 3/4/2022 11:54:15 AM | SENT |
| Amanda J. Tellez | | atellez@munsch.com | 3/4/2022 11:54:15 AM | SENT |
| Aynsley Young | | ayoung@munsch.com | 3/4/2022 11:54:15 AM | SENT |