# Exhibit M

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| T2 MODUS, LLC, Plaintiff, v. COLYNDA WILLIAMS-AROWOLO, Defendant. | § | |
| | § | CIVIL ACTION NO. 4:22-cv-263 |
| COLYNDA WILLIAMS-AROWOLO, Counterclaimant, v. T2 MODUS, LLC and JIM ROACH, Counterdefendants. | § | |

*****************************************

REMOTE ORAL VIDEOCONFERENCE DEPOSITION OF

JAMES A. ROACH

INDIVIDUAL CAPACITY AND AS CORPORATE REPRESENTATIVE

OF

T2 MODUS, LLC

TUESDAY, MAY 16, 2023

Volume 1 of 1

(REPORTED REMOTELY)

*****************************************

REMOTE ORAL VIDEOCONFERENCE DEPOSITION OF JAMES A. ROACH, located in Dallas, Texas, produced

as a witness at the instance of the DEFENDANT and COUNTERCLAIMANT, and remotely duly sworn by agreement of all counsel, was taken in the above-styled and numbered cause on TUESDAY, MAY 16, 2023, from 11:05 A.M. to 7:48 P.M., Central Time, via remote means, before PENNY L. PABITZKY, RPR, located in Nederland, Texas, reported by a certified machine shorthand reporter, with all participants appearing remotely from separate locations and pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

It is further agreed that Rule 30(b)(5) is waived by agreement of the parties.

CERTIFIED STENOGRAPHER'S NOTE: Please note that due to the quality of a Zoom-type videoconference and the transmission of data and overspeaking, audio distortion may occur which may disrupt the process of preparing a verbatim videoconference transcript.

Quotation marks are used for clarity and do not necessarily reflect a direct quote.

Job Number 225924

APPEARANCES

ALL PARTIES APPEARED
REMOTELY VIA VIDEOCONFERENCE

FOR PLAINTIFF AND COUNTERDEFENDANT T2 MODUS, LLC
AND COUNTERDEFENDANT JIM ROACH:

Terry D. Criss, Esquire
ATTORNEY AND COUNSELOR AT LAW
3010 LBJ Freeway
Suite 1200
Dallas, Texas 75234
972-919-6150
tcriss@terrycrisslaw.com

FOR DEFENDANT DEFENDANT AND COUNTERCLAIM PLAINTIFF
COLYNDA WILLIAMS-AROWOLO:

Ryan McCarl, Esquire
Davit Avagyan, Esquire
RUSHING MCCARL LLP
2219 Main Street
Number 144
Santa Monica, California 90405
310-896-5082
[redacted]

ALSO PRESENT:

Carol Risher, Paralegal
Rachel Rosenfield, Paralegal

CERTIFIED STENOGRAPHER:

Penny L. Pabitzky, RPR
NCRA - Expires 09-30-24
As An Independent Contractor For:
California Deposition Reporters
448 East Foothill Boulevard, Suite 101
San Dimas, California 91773
800-242-1996

## INDEX


| | PAGE |
|---|---|
| Appearances .................................. | 3 |
| Proceedings .................................. | 6 |
| Stipulations ................................. | 2, 7 |
| Lunch Recess ................................. | 196 |
| JAMES A. ROACH | |
| Examination by Mr. McCarl ............... | 8 |
| Signature Waived ............................. | 371 |
| Stenographer's Certificate ................... | 374 |


## REQUESTED INFORMATION

| PAGE/LINE NUMBER | DESCRIPTION |
|---|---|
| 263/13 | E-mail from 03/31/20 regarding Subject: Sample |
| 271/15 | E-mail from Brad to employees or any responses pertaining to wage issues |
| 274/15 | E-mails regarding salary issue |

## QUESTIONS INSTRUCTED NOT TO BE ANSWERED

PAGE/LINE NUMBER QUESTION BY

(None.)

## NONRESPONSIVE/MOTION TO STRIKE OBJECTION INDEX

PAGE/LINE NUMBER OBJECTION BY

(None.)

EXHIBIT INDEX
REMOTE ORAL VIDEOCONFERENCE DEPOSITION OF
JAMES A. ROACH,
INDIVIDUAL CAPACITY AND AS CORPORATE REPRESENTATIVE
OF
T2 MODUS, LLC
NOS. 1 - 10


| NO. | | DESCRIPTION | PAGE |
|---|---|---|---|
| Exhibit | 1 | LinkedIn profile of Jim Roach, 1 page | 38 |
| Exhibit | 2 | Spreadsheet, 16 pages | 131 |
| Exhibit | 3 | License and Services Agreement for T2 Data Science and Platform Solution, 5 pages | 160 |
| Exhibit | 4 | Employment Agreement between T2 Modus, LLC and Colynda Williams-Arowolo, 12/01/19, 4 pages | 202 |
| Exhibit | 5 | Video | 254 |
| Exhibit | 6 | Rough Transcript of T2 Modus, LLC's Demonstration Video, Narrated by Jim Roach, CEO, 6 pages | 255 |
| Exhibit | 7 | E-mail thread originating from B. Nichols, 03/31/20, 2 pages, CONFIDENTIAL 145 | 261 |
| Exhibit | 8 | T2 Intellectual Property, 1 page | 275 |
| Exhibit | 9 | Plaintiff T2 Modus, LLC’S Response to Defendant’s First Request for Admission, 17 pages | 347 |
| Exhibit | 10 | Letter to T. Criss and K. Simmerman from J. Rushing and R. McCarl, Re: Notice of intent to seek sanctions for continuing to assert frivolous claims, 02/27/23, 5 pages | 368 |

Ruby on Rails layer that's kind of a Monolith.
We've been writing Microservices that are essentially Python to replace a lot of that.
And then our presentation layer is React.
We also do -- all of our machine learning is all written in Python.
Q. Okay. So when you refer to those Microservices that you're -- well, let's -- I'm sorry. Strike that.
So the post -- let me just make sure I understand that if I'm --
THE CERTIFIED STENOGRAPHER: I need you to slow down, please.
MR. McCARL: Always happy to. Thanks for letting me know. You know, I get excited talking about technology because I'm an amateur coder, myself.
THE WITNESS: I'm glad you speak the language.
BY MR. McCARL:
Q. Well, PostGres is a database -- is a back-end database program.
A. Yes, correct.

on Rails layer.
Is that part of the back-end or the front-end or both?
A. We would consider that middle layer the layer that communicates between the database and the presentation layer, which is React. So all of the logic is in Ruby.
Q. So the -- by "logic," do you mean that any -- the selection of what to display, is that what you mean by "logic"?
A. Amongst other things, yes.
Q. What about the filtering capabilities? Is that in -- is that done through Ruby or some other layer?
A. It's done in Ruby.
Q. You said that you were writing some Microservices in Python to start removing some functions from the Ruby layer.
Is that what you said?
A. Yes.
Q. Okay. And what are the different services that are being moved?
A. I couldn't say specifically. It's -- my team's taking it apart and we're trying to write those things so that we can take advantage of AWS

Lambda services and it works very well with Python. So I don't know specifically which services are being done, but that's what's going on.

Q. Okay. And when you say "the team," who is it that works in this TechStack?

A. So our CTO is Jason Mathews and I previously mentioned Joey Silverbears and the other is Rory Ellis.

Q. Okay. Can you -- well, we'll talk about them in a moment.

You said the next -- moving up closer to the front end of the TechStack. The next one is React.

So React is what displays the user interface to the dealerships?

A. Yes. That's the UI.

Q. Okay. And -- and then finally you said that there was some machine learning being done in Python?

A. That's correct.

Q. Do you know the -- do you know the Python -- do you know whether the machine learning is done using a Python library?

A. It is not.

Q. So it doesn't use, for example, Psych It Learn or any other standard -- standard program or library to create neural networks?
A. To my knowledge, it does not.
Q. So how does it -- does it actually use a neural network?
A. AI is very complex; but, yes, it uses what I would consider -- and this is -- the last time I was over this, there's been a lot of work done since -- but my general understanding is that we're using kind of a blended model. And so, yes, it does use neural networks. It uses other types of technology such as, like, based on -- or based on things like random forest. It's a fairly complex AI.
Q. Uh-huh. So but -- so, typically -- so does it use the library called Pandas, for example?
A. Not aware. I don't know.
Q. You don't know. So do you know -- so you don't -- so -- are you -- do you know how to code in Python?
A. I do not, no.
Q. So which -- which -- what do you know -- do you know any programming languages, by chance?

A. Yes. I know C#.net, but it's been about 20 years.
Q. Okay.
A. So I haven't coded ever on tech companies, but I understand my people when they speak.
Q. Okay. That's perfectly understandable. So you don't -- you haven't personally been involved in writing any of the code that is in the T2 Modus TechStack?
A. I have not.
Q. And that's been true throughout the lifespan of the company?
A. Nine years, that's correct.
Q. The company's nine years old?
A. About to be ten in October.
Q. Okay. Congratulations. That's a long life for a start-up, and may it go on much longer.
A. Thank you.
Q. So who -- who was it that initially wrote the code at the beginning?
A. Initial was -- I'm going to forget his last name. His first name is unforgettable. Oliver -- Dr. Oliver. And it's somewhere in the file. Brilliant guy. But he was there to write

all of the original background. Yeah. So it's been -- God, I don't even remember the year he started that or when he left, Dr. Oliver. And we can get you the last name, I'm sure.

Q. Okay. That would be great.

Did you bring him the idea for the program?

A. Yes.

Q. Okay. And he was the person who -- I assume you paid him to do it.

A. Yeah. He was a full-time employee.

Q. Okay. He was -- was he a partner or owner or just an employee?

A. Just an employee.

Q. Okay. When did he stop working for the company?

A. I couldn't tell you specifically, but it's been a number of years.

Q. Okay. Have you ever seen the source code of the Python programs that are at the bottom of the TechStack?

A. I have not.

Q. Okay. So you don't -- you're not aware of -- so at the beginning -- you may know from C# that often at the beginning of source code there's

import statements that bring in other libraries that perform certain functions.

Are you familiar with that?

A. I've forgotten about everything I know about that.

Q. Okay. So you're not aware of any parts of the source code that use preexisting software?

A. No. I'm not aware of that.

Q. Okay. So there is such source code out there, though, right?

A. Yes.

Q. Okay. But was that searched for in discovery?

A. I don't believe so.

Q. Okay. Who has custody of the source code? Who would you ask for it?

A. If I wanted it?

Q. Yeah.

A. It would be our CTO.

Q. Is that -- is the -- the CTO, you said, was --

A. Jason Mathews.

Q. Jason Mathews.

THE CERTIFIED STENOGRAPHER: One at a time.

running the whole TechStack and doing coding?
A. No.
Q. How was it different?
A. He was a specialist in Ruby.
Q. Okay.
A. And he didn't know React. Of course, you had to know PostGres to be able to do what he did in Ruby. And he knew nothing about Python or any of our machine learning.
Q. But Mr. Mathews does know those aspects?
A. Yes.
Q. Okay. Great.
So have you personally reviewed the Python source code?
A. No.
Q. Okay. How is it that you know the different mechanisms by which it produces predictions?
A. Well, because from a theorist level, I've actually instructed one particular company on the theory of using -- it was called PartsTrader. And there was a period of time over a summer in which I took guys that were not -- they were familiar with code in general but not familiar with machine learning and used a program called DataRobot in

which DataRobot is generally -- is -- AI is a service -- and taught them the theories behind what fields you need to present, how you flow the fields through the selection process, taking the, you know, what's called "features columns" down to the minimals, competing the models, knowing how to measure the models, explaining what area of the curve is. So all of my knowledge around this is at the theoretical level, not at the code level. And so now that AI has become, in my mind, a commodity, the real magic is what is in the underlying data and the manipulation of that data. And that's the area where I'm an absolute expert.

Q. Okay. Then in that -- so can you tell me -- you used the name of some kind of company that -- you said DataRobot. There was another one that --

A. PartsTrader, the people I trained --

(Overlapping speakers.)

BY MR. McCARL:

Q. How do you spell that?

A. Parts.

Q. Uh-huh.

A. Trader. All one word.

Q. PartsTrader. Okay.

Coco's employment. We were working on an account for 13 dealerships. We were right there to sign contracts with them. And she came to us and asked us to pay, that some guys that referred -- that were part of one of the dealerships wanted to get paid on this contract. And, of course, that's unethical and we wouldn't do that. She asked three times within a week. That dealership group went totally quiet on us. And then we began to see cancellations of dealerships that were very close to Coco. She ended up signing that group with AutoMiner after her departure from T2. She left on December the 13th, saying that she was going to do training, back to phone training, that she loved the company, loved me, and would never do anything to hurt us. And I started getting calls within a couple of weeks of various dealers that wanted to use her for training, which I emphatically endorsed her training abilities and said, "Yep, she's great. There's no one better."

And then I started to get calls from some dealers that she had approached, saying that AutoMiner did exactly what they do -- what we do -- and did it at half the price. And one of those dealers tried them for 30 days and let them

go. They did it in parallel. Another dealer called me but didn't -- didn't cancel. But we had a lot of cancellations of dealerships. And when I -- when I saw Coco at Digital Dealer, we were trying to settle this. I asked her about Coughlin. She said, yeah, she did sign that group.

She basically told me that within six months, the groups that had signed with her that were T2 customers had left AutoMiner. But they didn't come back to us. This had to do with the -- I think the chip shortage. So all in all, it was about $123,000 a month worth of revenue we lost through those cancellations, not including the $600,000 contract with Coughlin. So almost --

(Certified Stenographer clarification.)

A. So in the first year, it was a total loss of almost $2 million in canceled contracts and contracts that didn't go forward.

BY MR. McCARL:

Q. Okay. So there's a lot of unpack there. But first of all, how do you spell this Coughlin?

A. C-o-u-g-h-l-i-n.

Q. And that's a group of dealerships?

A. It is. 13 dealerships in the Midwest.

(Overlapping speakers.)
A. Yes. Well, it's a --
THE CERTIFIED STENOGRAPHER: One at a time.
BY MR. McCARL:
Q. What was your degree from Northwestern? And your answer was a BM in musical performance. Correct?
A. Yes.
Q. Okay. So do you have any -- is there any other educational -- education that isn't listed here?
A. No. Other than my high school diploma.
Q. Any kind of certificates of some kind?
A. Only -- yeah. I mean, in terms of my certification in law enforcement with -- I'm not -- sorry. Not law enforcement. But as a private investigator. I have that. And the continuing education hours to go with that. I have certificates for those.
Q. Have we covered -- I -- I -- I know we started talking about the different hierarchy -- the hierarchy of different people in T2 Modus at this time; and what you said, if I got it correctly, was that you have you as the CEO. Pat

it did.

You know, so we then saw all of these people together who had worked for me that had -- was basically going to the market with this combined product of Conversica. And as a matter of fact, if I remember correctly in one of Coco's affidavits, she said that on the list she downloaded that she downloaded it and uploaded it to Conversica. And Conversica is a partner of AutoMiner. So in terms of the custody of that data, it went from our system into Conversica, which is partnered with AutoMiner.

Q. Is it your understanding that that -- that it was uploaded to Conversica because Freeman Honda was going to use that service?

A. That was her statement; but, however, I believe that -- you know, we found out about this, not knowing we had a problem yet. It was right after some dealers started calling me, saying that she was out -- saying she could do it for half price. And when we realized on a particular dev call -- couldn't tell you when, but I think it was in January of that year -- I just threw out the question, "Hey, has Coco tried to get into our system since she left?" And then we went on with

the meeting.

And Rory, in the background, did a search and found out that there was a log-in from -- that came from Freeman Honda using Wyman's credentials, but came in from a California IP address and downloaded a uniquely large set of records, about 4500 records, that had a score above 70 percent on the predictive score.

It was at that time that we started going "We got a problem." And that's the time when we reached out to the initial attorneys on this case saying, "What do we do? You know, have we had a breach? How do we handle this?"

They sent a letter over to Freeman Honda going "Hey." And we didn't name anything other than, "Hey, we have suspicious log-in activity and download and it was Wyman's credentials but the IP address is in California. Do you know anything about this?"

And we got no response. And then the letter came from the law firm. And, subsequently, sent a second letter, I believe. I don't know the interval. But that went to the managing partner, Dane Miner, saying, "Do we have a problem? You know, have your customers been notified and what's

A. Okay.
Q. I'm sorry. But since I'm not the deponent, you should explain what you mean by that.
A. Okay. So "area under the curve," so that's basically our measure. And so it makes these particular predictions and then we find out what actually happened. And all we do all these years later is that we change the input data until the accuracy improves. We don't touch the code. So, to us, we don't know what Oliver wrote. I don't know what Oliver wrote. And nobody on my team knows what Oliver wrote. But we just change the input information until it calibrates again.
Q. This change, are you referring to different epics of the neural network trading?
A. We don't change any of the code in the neural network at all. We just change the input criteria until we see the area under the curve increase.
Q. So the -- okay. So -- so -- so the neural network does not deciding -- is the neural network deciding which features match some target output?
A. We don't know.

sources; is that correct?
A. Well, it doesn't have any of its own obviously. So it's either going to be dealer source data, the dealer and -- that has the postproduction because we're going to run it through all the cleaning process. So it's going to be that plus any other data that we append to it. But on the output file that's downloadable, those are the primary features that AI is looking at. So it tends to throw most of the rest of the stuff away.
Q. How do you know that, though? Because I thought you didn't -- you didn't know what -- well, why it was selecting certain features as important?
A. Well, because we had tested, you know, what if we add this, what if add this, what if we add this; and we just don't see any real move in the ALC -- area under the curve.
Q. Let me just make sure I understand your previous answer correctly. So all the data that is fed into T2, which are customer records relating to purchase and ownership, that's the data that's fed into the neural network, right?
A. Purchase, ownership, service, prospect,

et cetera, et cetera, post processing through the T2. What we call extension pipeline.

Q. So all these records and variables that they contain come from sources other than T2 originally; is that correct?

A. Yes. We're strictly a data processor and apply our technology to external data.

Q. Okay. Can you tell -- we'll talk about the video that you sent in a bit.

But can you just tell me what are the different -- when a customer logs on -- so a customer is a dealer -- dealership. When a dealership logs onto its T2 portal, what options does it have for exporting data? What reports can it export?

A. So it's boolean logic. And that starts with the subset. So you can select -- and the way I thought about it when I designed it was do I want to only see customers that are native that I sold or do I want to see only garage vehicles? Do I want to see any other subtype or do I want to see everything? So that's the first selection.

Second is "customers that." So thinking about boolean. So you have a number of filters there. So you say customers that you --

Smith doesn't own the car and Fred Jones does, if Fred Jones doesn't exist in the dealer's database, then the only way that I can tell the dealer about it is if it -- he has -- if he doesn't know Fred Jones, he has to have a recall, we will not put that -- even if he has a recall, we quarantine it. So in that system, you cannot see anything that is not straight down the middle DPPA permissible.

Q. Okay. So you put this in as a shield to protect yourself and to protect the dealership against DPPA violations?

A. That's correct.

Q. But other than disqualifying certain -- I think what you just described, if I understand, is essentially disqualify certain records from being returned. Is that fair?

A. As far as the quarantine, we -- it's not even searchable. It's in a whole different container so that it can't possibly be exposed.

Q. It's removed from the set of possible records that could be returned when they export data?

A. That's correct.

Q. So, therefore, when the dealership exports data from the portal, it is only records

that they have a right to see and data that they have a right to see under the DPPA.

A. That's correct.

Q. And when it comes to these variables, it sounds like this SRP -- the SRP, you said, is -- let's start with that.

The SRP is prediction of likelihood of purchasing within 90 days?

A. That's -- yes, it is. And actually it -- a little bit of history on it. It was originally designed to tell us which people we need to recheck the registration on because they should not own the car. And when we started finding out that the people we recheck registration on that still owned the car and we rechecked again and again, and we started to see a pattern.

So, initially, it was just an internal score about seven or eight years ago. And then we realized, "Oh, my god. It's actually predicting, you know, who's going to buy." And so that's when it -- we brought it to the front.

Q. Okay. Are there any variables -- so -- I'm sorry. Strike that.

When -- when a customer -- when a T2 customer, namely a dealership, logs onto its T2

portal and filters data to export, what it's filtering are records of -- consumers would have -- who have bought from that dealership only?

A. No. So the permissibility -- so -- so think about a term that we use a lot, it's the customer VIN pairing. So you have a customer that we know who it is and we know it's correctly paired to a vehicle ID number. So for that customer, the dealer -- part of the append is the dealer can also know what other vehicles are in the household. So -- because when we rerun that, we get that. And so we do give the dealer that because what's protective under DPPA is the PII, not the vehicles.

So they get that. And then they would get any subsequent second or third owners where they were already in possession of the PII.

Q. So this -- so -- but each customer, themselves, was originally in the dealership's software?

A. Yes. I had to -- oh, it could have also been -- if -- through the DMS, they had a transaction. So they either bought a car, bought a part, did service. If they're in the CRM, they would only be a lead, in most cases. Because the

CRM contains a duplicate of the DMS data but then it contains all prospects that submit a lead from the beginning of time that never transacted anything. But since the dealer came into possession of that PII, in the quote, normal course of business, then even though it was just a prospect, it's okay for the dealer to append that information and see what's currently true.

Q. So every -- every export of the dealer's customer data from the T2 portal is -- it will never include a name that is not -- that the dealership has not already identified as a customer or lead.

A. Yes, that's correct.

Q. And you said -- but you did say that there were -- that there was other information that did not come from the dealership. And you -- and -- and you listed, in particular, vehicles owned by the household.

A. Right. They would not be -- that would only be when we run the registration on that particular customer we get all vehicles registered to them. So the dealer does not have that information until we append it onto the customer record. So part of what we consider correction in

appending is -- is filling in blanks. Like, if you don't have good phone number and e-mail address or you got a wrong mailing address, we correct that, fill it in. And if you don't have all of the vehicles registered in because if he -- he no longer owns the car he serviced or -- or bought from you, then in order for you to be able to talk to him about anything meaningful, having a garage, we don't know what unit, which vehicle you would be talking about. And that is -- it's permissible to update the customer record with other vehicles owned.

Q. All right. And so are they -- when -- when -- if you worked -- if a dealership were to export all of its data about -- that's in T2, namely, all of its customers and every field associated with those customers in the T2 system --

(Overlapping speakers.)

A. Yes.

BY MR. McCARL:

Q. -- is one of the fields household-owned vehicles?

A. Yes.

Q. And that includes vehicles that -- that

have T2 as identified were purchased by somebody other than the customer?

A. Oh, I see. Okay. So your definition of household and mine are a little bit different.

So we will only tell you about vehicles that are -- were under this primary customer that the dealer has a PII on is on the title --

(Overlapping speakers.)

BY MR. McCARL:

Q. All right.

A. -- so that would be what we mean by that.

Q. Okay. Great. So it's impossible to learn about the identity of -- of -- of anybody other than the people whom the dealership submits.

A. Yeah. So when we get a -- we run something and we get a title, both you and your wife could be on that title but we don't have her record and she's not in the database. So I can't put her in there, but I can append you, that you're on the title of this particular vehicle and she's on as well. But we don't -- the dealer doesn't know she's on there as well.

Q. And one of these data services that you pull in -- that you pull in data from other than

There's something -- maybe a slight difference in the pronunciation or the spelling, but --

(Overlapping speakers.)

BY MR. McCARL:

Q. What do you mean by that?

A. Okay. So the Levenshtein algorithm is a mass algorithm that assigns a component -- so each component of -- like, for instance, your last name would be assigned a value. And they give you a better -- overuse case of that, if you've ever done genealogical research, there's this thing called soundex. So a lot of people were illiterate. So how many ways are there to spell Smith? With an E? With a Y? So the Levenshtein essentially takes that input, part of the name, first or last, and says if the -- if it doesn't match within a mathematical range, it isn't you.

Q. I see. Yeah. Okay. Now I'm familiar. This is a standard technique in natural language processing, right?

A. It is.

Q. Not something -- just -- just -- just to be clear: It's not something T2 came up with.

A. Oh, no. I wish.

Q. For sure. Okay. Now, to go back to the

scenario I mentioned a minute ago: If you're a T2 customer, namely an auto dealership, that subscribes to your software and you want to export all your customer data, so in other words, you turn all the filters off and export it, that's possible. Correct?

A. Up until we -- we have a cap and we set that -- this wasn't in place prior to Coco. It is now -- but we have a 5,000 daily download cap. And so --

(Overlapping speakers.)

BY MR. McCARL:

Q. 5,000 --

THE CERTIFIED STENOGRAPHER: Excuse me.

BY MR. McCARL:

Q. 5,000 records? Is that what you mean?

A. 5,000 records per day is the limitation of downloads.

Q. So they can only gain -- they can only retrieve or download data, about 5,000 customer records per day.

A. That's correct, average. One of our dealers has between 2- and 300,000 records in their database.

Q. Okay. So -- but -- but on the -- on the -- on the day that -- that Freeman Honda's data was downloaded, according to the complaint, January 6th, 2022, there was no cap in place.

A. There was no cap at that time, no.

Q. And do -- what filters -- do you -- do you know -- do you know what filters were in place when -- when Freeman Honda's data was downloaded on that day?

A. If I remember correctly, it is customers who have Hondas that have an SRP score above 70 -- the 70th percentile. And that would have been about 4 percent of their total records, if I'm remembering correctly.

Q. Okay. And so at any time -- at -- or, you know, say on January 1st, 2022, a couple days before or January 6th, Honda Freeman was able to log in to the account and download that information?

A. According to the contract -- and so this one was a little strange because --

(Overlapping speakers.)

BY MR. McCARL:

Q. I don't care about the contract yet. We'll get to the contract. Let's -- so I'm

just -- I'm sorry. Just to redirect you for a second.

I'm asking about what it can physically do. What it can accomplish on the software.

A. On that specific day it would have been possible to -- for Freeman Honda to log in to the system and download that list.

Q. Okay. And, now, we -- now, I'll let you say what you were going to say about the contract. So the contract, you -- you're saying -- you have a caveat about the contract; is that -- is that right?

A. We do. So within our contract terms is -- we think it's one of the reasons they didn't respond to our questions, do you know anything about this -- is because in our contract, it says that once we receive notification of a cancellation, the effective date of that cancellation, that all -- your license no longer -- all the amounts are paid and your license is over. And according to the e-mail we have from Freeman, from the GSM, the effective date was January 1st. So from legal terms, there was two problems. It's nothing should have been

supposed to sign. So it was early, a week or so into -- I have the e-mail from Desiree where Desiree reached out to Wyman and Wyman said, "Oh, no, man. We canceled. Effective date January 1st."

Then she said, "Well, we'll look for it. But send me an e-mail to that effect." And he did. So we have not been able to locate anything other than that e-mail.

Q. Okay. And so it was -- so their cancellation was first communicated to you after January 6th?

A. It was.

Q. But you're saying that they said their effective date was before?

A. They said it was January 1st in Wyman's e-mail to us. So that would be --

(Overlapping speakers.)

BY MR. McCARL:

Q. Then --

THE CERTIFIED STENOGRAPHER: Excuse me.

BY MR. McCARL:

Q. Okay. All right. I just want to make sure I understand correctly that before

January 6th they didn't actually communicate to you that they were going to cancel software.
A. If they had, we didn't know. We've never been able to find that communication.
Q. All right. So, to the best of your knowledge, they did not?
A. That would be a good conclusion.
Q. When they sent that -- when Wyman King of Freeman Honda sent that -- that information that we had -- that we were canceling as of a week ago, January 1st, was that on -- what date was that? Do you know?
A. I'd have to go back to the e-mail. You have it. We produced it.
Q. But it -- it -- it -- so -- and I don't -- we can look -- sure. We can look at it, but it was after the download on January 6th?
A. I couldn't -- I don't recall.
Q. You -- so -- so I -- so notwithstanding the contract term, when the customer notifies you that they're ending the contract, on that day do you cut off their access? Does T2 cut off their access to the portal?
A. Sometimes yes; sometimes no. It depends on whether or not we feel like that there's a

chance of salvaging the account.
Q. So in most -- it seems to me -- and you can tell me if you disagree. But most -- do tell me if you do disagree. But most software subscriptions, you're paying in advance for a certain period of time, just like paying rent in an apartment; is that right?
A. Yes. But except that our contract specifically reads that, you know, you're going to pay up through the end of the upcoming month from the date of the cancellation. So we would have recognized that as through January, but your access would still cease. It's in our contract.
Q. Okay. But some -- but you didn't always actually turn off the access?
A. Depended on the account and we thought if it was salvageable or not.
Q. And so as of -- as of January 6th, 2022, you haven't terminated Freeman Honda's access to its account?
A. Obviously.
Q. Because you hadn't received notice of a cancellation.
A. Right.
Q. And so -- what occurred that day is

that -- is that somebody logged in to Freeman Honda's account using their standard log-in credentials?

A. On the day our records in our system show that there was a log-in, we see, if I remember right in talking to Rory, there was an initial log-in where no action was taken and then immediately after a second log-in. And both of them were using Wyman's -- Wyman King's credentials from an IP address in California known to us to be Coco's.

Q. Known to you how?

A. Because she previously had credentials in our system and we have a log file. So when she logged in under her own credentials, we always saw that IP address logged.

Q. Do you know what the default password is for dealerships when they come on board?

A. I do not.

Q. Do you know whether there are any password requirements?

A. Yes, there are. It's -- the password requirements is when you first go to log on, there's an e-mail sent to you giving you a link to set your own password. And so we can't see any

dealer's passwords. We have no access to those. We only have our own. And so no one in our company could go in and retrieve a password and log in under that. You would have to have that handed to you.

Q. So -- so if -- if Ms. Williams downloaded the Freeman Honda data on January 6th, 2022, she would have gotten those credentials from Freeman Honda?

A. Yes, that would be assumed in what we saw in kind of her pattern and practice. Our company policy -- and she's written up several times on this -- was -- was never to touch a third-party system, never to download records on behalf of the dealer, load them up into somebody else's system; and, after the fact, we found out that was her course of action. She worked with a small number of dealers that she did all of the work for them. And she used her own credentials because what was odd about Lyman -- or Wyman is he had not logged into the system in months. So all of the work that had been done had been done under Coco -- under her log-in; and she was uploading this to, by her own admission, third-party systems such as Conversica. And she was -- that's against company

copy policy and had been written up on it more than once.

Q. We're going to have to -- so I want to just -- have to backtrack to this for a little bit of what you said.

A. Okay.

Q. So you mentioned that T2 doesn't even store the dealership's own passwords in its systems, right?

A. I didn't say that. It has to be stored in terms of it has to match, but it is not accessible. I believe it exists in hash. I don't know the particulars, but it has to exist in the system.

Q. It has to be -- but it's encrypted through some kind of hash algorithm --

(Overlapping speakers.)

A. Something --

THE CERTIFIED STENOGRAPHER: Excuse me. Excuse me --

A. Something keeps us from being able to access it.

MR. McCARL: Sorry. Two tech people.

BY MR. McCARL:

Q. So the question -- the question was -- that -- well, let me just scratch that. So let me just ask another way.
Although Freeman Honda's password can be -- is in -- somewhere in T2's databases, it cannot be accessed by anybody at T2?
A. That is correct.
Q. Okay. So even if there was some genius hacker who broke in and had full access to T2's accounts and databases, they could not find Freeman Honda's password anywhere?
A. I hope not.
Q. I asked you about the password requirements and you -- you mentioned that they -- as with most software, they -- a new customer logs on and sets a password. But my question was a little bit different. I meant to get at: What are the minimum requirements for the password? Do they -- are they required to -- to use special characters?
A. No, we do not. They set that password pretty much however they want to.
Q. Okay. You -- you said that the download -- and if I heard correctly, the download on January 6th that you attribute to Coco used

Wyman King's credentials; is that correct?
A. You know what, it showed -- he showed up as a user in our system and passed a password challenge. We don't -- we don't see those credentials, obviously. But, yeah, it says in our log files that it was Wyman King logging in and recorded the time, date, and the IP number that it was coming from.
Q. Okay. And so it's your understanding that -- that although Ms. Williams logged in to teach to -- to Honda to Freeman Honda's T2 portal, she did so using Freeman Honda's login credentials?
A. Yes.
Q. And she was provided those by Freeman Honda?
A. I don't know.
Q. She couldn't have obtained them by looking at T2's system?
A. No.
Q. Okay. I want to -- I want to backtrack for a moment. Well, let me -- let me just ask one more question. I think I know the answer to this; but there was no hacking or anything that went on, on January 6th, correct?

A. Define "hack."
(Certified Stenographer clarification.)
BY MR. McCARL:
Q. What I'm asking is that the log in that occurred that's described in your complaint on January 6th, 2022, was a log in through normal processes provided to the dealership?
A. Our position would be that it's an unauthorized access of the system by the definition of what we say "authorized" is.
Q. By which you mean that it violated the licensing agreement between T2 Modus and Freeman Honda?
A. I think it's in general terms. If I obtain someone else's name and password and log in to a system presenting myself to be them and then exercise rights that they have in the system, I think that's an unauthorized access. Just my opinion.
Q. But the access occurred by her logging in using Freeman Honda credentials which T2 issued for that purpose?
A. We issued credentials to Wyman King and he had rights to do certain things in the system under that, issued some --

(Overlapping speakers.)
Q. And did those --
THE CERTIFIED STENOGRAPHER: Excuse me. I didn't get the answer. One at a time, please.
A. My answer was that Wyman King was issued credentials for the use of Wyman King under the license agreement and specifically no one else.
BY MR. McCARL:
Q. Right. And the log in occurred using those credentials?
A. That's correct.
Q. Now, did anything happen in the course of that access to -- to the Freeman Honda T2 other than --
(Certified Stenographer clarification.)
BY MR. McCARL:
Q. My question is during the access that we're talking about, on January 6, 2022, to Freeman Honda's T2 portal, did anything occur in the system other than the download mentioned in the complaint?
A. Not to our knowledge, but we don't log everything that happens.
Q. If Freeman -- if Wyman King, himself, had

logged in that day from on-site at Freeman Honda and had an active software license, could he have done the same thing that Coco Williams allegedly did?
A. Yes.
Q. And you mentioned that in the data that was downloaded that's -- that's -- there's some kind of export function.
Is it called "export download"?
A. So the exact process is you create a record in "search" and you export it. And when you export it, it goes to a section called "campaign management." Campaign management shows the list, and it goes through a read-out validation process. And you'll see -- a list on top is account of records that passed through the validation, and there's account of records that didn't make it. And then once that completes, then you have several options, one of which is download.
Q. So the search that the user, the dealership, performs to retrieve these lists that's what creates the campaign?
A. Exactly.
Q. And then once the campaign is created, a

campaign is -- fair to say that's another term for a filtered customer list?
A. That's correct.
Q. And it can -- and then that list can be downloaded?
A. It can.
Q. Now, in that download you mentioned that only one filter had been applied, which was the -- that the SR -- the SRP score -- probability score was 70 or higher. Was that right?
A. There were two, to my knowledge. One is that they would have to be Honda's.
Q. Oh, yeah, Honda's.
A. And the second one was the SRP.
Q. Got it. Okay. So are there -- is it fair to say that -- well, so first of all, let me ask you this.
When the customer then downloads that data, does it come out in a CSV file?
A. Yes. On a local machine.
Q. Say that again.
A. Yes. It does that on their local machine.
Q. Okay. It would go to their downloads file folder?

A. Yes.
Q. And a CSV file is comma separated values?
A. Correct.
Q. Is it your understanding that it's a text file in which each line is -- is a set of data, a single record?
A. That's correct. And CSV is a more normalized delimited file where there's a delimiter between each record component.
Q. Is it your understanding that the first line of the record is typically the names of the fields separated by commas?
A. Yes. The headers.
Q. Okay. The headers. And then the second, third, fourth line and so on are going to be particular records?
A. That's correct.
Q. And in the case of these downloads from T2 software, they are customers of the dealership?
A. Yes.
Q. Okay. So what was downloaded on January 6th, 2022, that you allege Coco Williams downloaded was a CVS file of records of the dealership -- of the dealership customers?
A. To be clear, so that -- the word

"customers" has all kinds of different applications. Such as, under TCPA, it's defined -- if you've got a business transaction in the last 18 months.

Some of these people may be second owners of which you had no interactions with other than you received a lead five years ago when you had PII. So I would be careful with the use of "customers," but they were permissibly owned -- or permissibly available to Freeman, yes.

Q. Well, you said -- you testified earlier that all the customers that could be accessed in these downloads were on T2's portal, are -- are records provided by the dealership of either somebody who bought something from the dealership, had a service done at the dealership, or was recorded as the lead in their CRM; is that right?

A. I gave you two exceptions to that. One is CRM, which wouldn't fit any of those. And that is -- so as long as the dealer has obtained that information in the normal course of business. CRMB one, manifests lists for manufacturers, marketing lists, anywhere they have the PII from, or any PII that matches data that we pulled. So it's a much broader than just they did a

transaction with them.

Q. Yeah, okay. I understand. Maybe I'm not being clear. But -- but I'm -- the testimony earlier was that every one of these names that could be retrieved is either a customer or lead of the dealership.

A. And then that's -- it's a customer or it is permissibly connected to a customer where they have had an interaction. "Customer" is just a really tough term. I worked in dealerships and --

Q. Sorry to interrupt you.

I'm not trying to trap you here. I think I understand your testimony earlier was quite clear that every one of these names was supplied by the dealership; is that right?

A. Yes. That seems right. I'm trying to think about the second owner matching, but that -- yes, they would have to have that in there. I'm good with that.

Q. Okay.

Now, in the download -- in the downloaded CSV file that Ms. Williams or Freeman Honda downloaded allegedly on January 6th, 2022, are the fields that would appear in that file -- the different -- the different, sort of, columns

of each record, is that the sum total of the available data that a customer could download?

A. Yes. I think so. In the -- in our search we have, when you go to -- you have columns to display. And so there's a whole list of columns in there, and they may or may not be on the screen. But my understanding -- and you can test this reasoning.

But my understanding is that if I download the list, I'm going to get all of those columns whether or not they display or not.

Q. Oh. Oh, okay.

So you can't filter out so the CSV file only contains certain columns?

A. Not on a CSV export, you cannot.

Q. And it's fair to say for the laypersons reading the deposition transcript that a CSV file is like a text version of a spreadsheet?

A. It almost is exactly a spreadsheet except it's not in Excel. It's in a file format that Excel can read and turn into a spreadsheet. Yep, you're right.

Q. So commonly CSV are turned into Excel spreadsheets and vice versa?

A. Yes. And many other type of file

So this a redacted -- what it appears to be is a version with redactions of what could be exported from your system? What it --

(Overlapping speakers.)

A. That looks -- well, that looks right, yeah. I mean, it seems -- it seems right. I mean --

BY MR. McCARL:

Q. Okay.

A. Go ahead.

Q. And this is -- so this is, I believe, the one -- this is the one, I believe, that was attached to the file with our motion for summary judgement that was attached to the Williams' declaration.

Does that help you remember that you've seen it?

A. I think so, yeah. As I'm looking at these column headers -- like, couldn't pay her interest. Like that's a derived -- there's some derived things in here.

Q. To the best of your knowledge, does this seem to be what --

(Overlapping speakers.)

A. It does --

BY MR. McCARL:
Q. -- was downloaded.
A. It does seem to be, yes.
Q. This is what Ms. Williams downloaded on January 6th except for the redactions?
A. It does seem to be, yes.
Q. And these are -- each line of this -- the spreadsheet or CSV file is a Freeman Honda customer or a lead?
A. Well, we're still having problems with -- because the unbacked data would not be considered a lead or someone that they had done any business with. So if they uploaded a recall list or a marketing list or all of those kinds of things, that's why I'm a little troubled by the term "customer." But I would say --
(Overlapping speakers.)
BY MR. McCARL:
Q. I'm asking: Was every -- is every single record -- meaning every row other than header row -- a name that was supplied by Freeman Honda?
A. In one form or another, yes.
Q. Can you read the field names? Or are you familiar with them, if you can't quite read them?
A. Oh, no, I'm familiar. I can read them.

campaigns at various third-party fulfillment systems.

We do not consider the downloading of the list the best practice. We think if you want to action that list locally, you should -- we have technology that will export this at whatever rate you want to render a record rate at a time to the CRM, and that's where you should do it.

We advise our dealers that the only reason you would do this is if you're going to do a big mailing. And then we ask them to put us with the mail company. We'll give them a SFTP folder, and we will shoot over only what they need, which is the name and address. And if it's supposed to talk about what car they have, we'll shoot that over too. But we don't ever, you know -- so this is -- we don't advise that they do this.

Q. But as a practical matter, they could if they want to, and that's what happened here with Freeman Honda?

A. Well, we don't know what happened with Freeman Honda, but when it comes to a dealer coming in there and wanting to download portions of this list, yeah, it's going to end up in a

5,000-a-day CVS -- or CSV file and how you use that, I don't know. But, yeah, they could, in theory, do that --

(Overlapping speakers.)

BY MR. McCARL:

Q. So they have a right to do it, and then there's a function provided for that purpose?

A. With limits, yes.

Q. The limits were added after this lawsuit was filed?

A. Yes.

Q. And not in place at January 6th, 2022?

A. It was not, and it was -- we realized that it's possible for someone to come into the system and download these sensitive customer records. So we wanted to limit the exposure, you know, that they just couldn't give a bunch, and then we would have a detection point.

We also did a complete -- after they accessed our system, we did a complete security assessment. We brought in dual-factor authentication. I mean, we tightened everything up really, really tight to where this couldn't possibly happen again.

Q. In other words, on January 6th, 2022,

there was no two-factor authentication in place?
A. That's correct. Yeah. And we had gone through, in terms of compliance, based on what we had and what we were doing, many, many systems in the automotive realm -- and I've been doing this a long time -- did not have dual-factor authentication nor was it required. We never found a reason.
In nine years of operation, we've had no one try to come into our system without authorization. So, you know, it's kind of like buying a burglar alarm after you get burglarized. So that's -- we spent a considerable amount of money going through and creating this so that this particular type of activity could not happen again.
Q. But this activity is simply somebody logging in using the dealership's credentials and downloading --
(Overlapping speakers.)
A. That would be -- sorry. Go ahead and finish your question.
BY MR. McCARL:
Q. That's my question, you're saying burglary, but what happened is there was no break

in into the system. It was that somebody logged in to their licensed portal and downloaded their own data.

Is that not accurate?

MR. CRISS: Object to the form of the question.

You can answer.

A. Okay. So what I would say is, if someone were to obtain a key to a building and they did not have authorization to access that building and they got that key from someone that it was not considered under terms of the use of that building to have that key, and just because they used a key to enter the building does not -- not make it breaking and entering.

So I -- we consider this unauthorized access to our system. And the main reason that we've looked at this as a problem is we don't know where that file went.

We know that at least it went to Coco's local machine. She says in her affidavit that she uploaded it to Conversica. We don't know if anybody at AutoMiner got to see it. We don't know if anyone at PureCar got to see it. We don't know where it went. And that's not what we ask

the dealers -- or demand that the dealers do in terms of custody and control of this very sensitive data.

BY MR. McCARL:

Q. Okay. So on January 6th, 2022, you've said that you had not received any notice of cancellation and the software license remained in effect on that day, correct?

A. As of that date, we weren't aware that there was a cancellation. If you take Freeman at their word, then they had submitted a cancellation prior to January 6th. And so that's what they state that they did --

(Overlapping speakers.)

BY MR. McCARL:

Q. And as of that day, Freeman Honda and sales agent, Wyman King, had log in credentials to log in to Freeman Honda T2 software, correct?

A. They would have had we not -- had not been aware of a cancellation, and we were not. And we removed all his credentials once we got his e-mail.

Q. And this access that occurred was Coco Williams logging in to Freeman Honda's system for Freeman Honda in place of Wyman King?

Honda gave her that authority. So we don't know. I mean, we really --

(Overlapping speakers.)

A. That's why these are facts that we're trying to determine --

(Overlapping speakers.)

BY MR. McCARL:

Q. But you don't have any knowledge that it was done without Freeman Honda's authority?

A. I don't know either way, no.

Q. And you said you read the Wyman King declaration.

Doesn't it say, yep, I'm Wyman King, I have a license, and I gave my log-in info to Colynda Williams?

A. In general terms, you know, that's what he's saying. But if somebody's your friend, after the fact, and says, "Hey, I need this from you," if it's not officially -- Wyman King is not a signer to the agreement. He's not in any capacity with the dealership, has any authority at all. So if the dealership were to put that down, that would mean that they knew something. But Wyman -- I don't know whether he told me about the dealership -- what they did. I know they had a

real hard time with it. So, you know, I don't know. I mean, that's why we're trying to get to the --

(Overlapping speakers.)

BY MR. McCARL:

Q. I'm just trying to figure out what you know. So, to the best of your knowledge, you have no information that anything -- you have no information that would tend to disconfirm the statement that Colynda Williams did this for Freeman Honda at their request?

A. Yeah, I don't know either way. I don't have any information either way.

Q. All right. Thank you for this. I'm going to introduce Exhibit 3.

(Marked Exhibit Number 3.)

BY MR. McCARL:

Q. Take a minute and take a look at this.

A. Sure. (Perusing documents.)

Q. Okay. Are you familiar with this document?

A. Yeah, I am. It's pretty familiar. I mean, it's been updated since then; but, yeah, I believe this is the form in -- which we used as of this date.

Q. But you're really speaking in terms of metaphors -- brain metaphors rather than --
(Overlapping speakers.)
A. I have to -- sorry.
Finish your question, please.
BY MR. McCARL:
Q. It sounds to me like you're -- now you've shifted to talking in terms of metaphors of the human brain rather than specific software techniques.
Is there any software technique, that you know of, that implements this idea?
A. Yes. This is what our chief AI guy -- didn't have the "chief" in his title -- but Dr. Oliver implemented -- and we saw the results, the throughput increase. We saw the accuracy increase. And I'm taking him at his word. This is the -- what he applied, and so we believe that's what happened.
And that was the, "Hey, here's an analogy. Do you think we can get this to work, and we can get more neurons firing?"
And it worked. So that's all I can tell you about --
(Overlapping speakers.)

BY MR. McCARL:
Q. Sorry.
A. -- it.
Q. You noted that you hadn't seen the source code, or done the programming yourself.
So that's why you say you had to take him at his word?
A. Yes.
Q. And you also noted that because you hadn't seen the Python code directly that contains the machine learning algorithms -- well, you did say that, right, you hadn't seen the Python code directly?
A. I did say that.
Q. And you didn't have any way of knowing whether there were any third-party software libraries that were imported as part of the program?
A. I know that our guys have a directive, generally, not to use open source. But I don't know specifically that they did not use, like, RubyGems or anything like that. I don't know.
Q. Well, open source would be one category. But even more broadly, you don't know one way or the other whether -- whether the code that

contains the machine learning algorithms imports other software libraries whether licensed or open-sourced?

A. Right. I'm not in the weeds.

And so when I refer to a "black box" and say it's a "black box," to me, I know what is going in, in detail, and I know the results of what's coming out, but I don't know the code.

Q. Okay. So it's possible that the neural networks are not being spun up from scratch but rather using an outside library?

A. Well, I don't -- I don't know that either way. Some thing -- anything's possible. I don't know, but I don't believe that's correct.

Q. But you don't have any reason not to believe it's correct?

A. Yeah. I -- I -- one, I'm going to err on the side of I don't believe it's correct is that we -- I've had several different companies and worked with special -- when I had Intrametrics, the two main DMS providers decided to put their systems, which are built and pick, on top of open-source drop operating systems. And I've seen a lot of challenges about all kinds of it.

So our guys were under a directive.

It's like, look, you know, don't -- don't do that. You know, so -- so that's why I believe that, but I don't know that to be fact.
Q. You don't know one way or the other --
A. I don't --
(Certified Stenographer seeks clarification and requests again that only one person speak at a time.)
BY MR. McCARL:
Q. I'll start over.
You haven't seen the software code. So your knowledge of how it operates comes from the directions you've given and what you've heard secondhand from the coders?
A. And the observation of the functionality working, yes.
Q. Okay. Just to revisit and make sure we're clear on the patent thing.
To your knowledge, T2 Modus has never applied for a patent?
A. That's correct.
Q. And never obtained one naturally?
A. That's correct.
Q. You said -- you've personally obtained six patents, did you say?

cross-trained -- the three guys are cross-trained, you would have to have three simultaneous bus accidents to beat a problem. It's not ideal but all of that information resides in three brains, all of which are cross-trained to be able to take over any area. So that's how --

(Overlapping speakers.)

BY MR. McCARL:

Q. Well, with the exception that you said that you don't quote directly in the TechStack?

A. Could you say that again?

Q. You said that you -- the three brains, which I assume is you, Jason -- and who was the third one?

A. I don't count myself in that. So that's Jason, Rory Ellis, and Joey Silverbears. The bulk of all of the coding knowledge and how everything interacts and how we do everything is contained in those -- those three brains.

I'm the 50,000 foot air traffic control guy that says, "Here's what I need it to do. Here's concepts we need to change. Here's things -- and here's some ideas." And that's how we're structured. So new CTO would be relying heavily on the remaining team to spin them up.

Q. Okay. So sometimes coders, as you may remember from your coding days, put comments in source code, and that can kind of serve as documentation in a very loose way.

But do you know whether there are any comments in the source code?

A. Well, I would say we use probably -- and Jason is the one that kind of keeps me up to speed on this. We had one guy we hired -- he didn't last too long with us. And what Jason told us is, like, this guy is pretty bright, he's pretty intuitive. He comes with some out-of-the-box stuff, but he doesn't follow general practices.

And so Jason is good at general practices. And I believe -- don't know, but I believe that we would have comments within the code. But it's not towards the eye of being able to inform a second person as to what she should do here. The main thing, if you think of us as a really underfunded company that's in a really unique spot, everything with us is about speed, speed, speed, speed.

And so the guys just -- you know, they go to the next thing, the next thing, the next thing. So if they had to sit down and --

like, for code review, like, common out something completely, the fact that everybody is doing reviews and CTO is a coder, they can just send it -- send the code. And so I would say, again, speculation, that our commenting within the sections would be less than what you would see at IBM.

Q. Just to be clear: Everything you just said is -- and there's nothing wrong with this. I just want to make sure we're clear on the record.

Everything you said is speculation because you haven't seen the source code?

A. Exactly.

Q. All right. And then the -- the next question I have for you is -- I just wanted to circle back to this.

You said that there was a "dev" team meeting, I believe you called it, in January of 2022 in connection with -- in connection with the Freeman Honda's data download.

Was that correct on the date?

A. I don't know when we had it. We have one every Friday at 11:00 a.m., and this meeting was definitely not called to discuss this. It was just our standup meeting every Friday: What did

this -- you can get to do this, this, and this. But just good common sense says we don't normally do this, like, give a guy money back or waive their billing because we never have.

And we talked about it on many, many e-mails where Coco had brought up giving someone a billing holiday. That was a AutoAlert practice. We never did that. We told her, "Stop bringing it up. Don't do it."

And then it tells me because the e-mail was dated December 1st, that she knew when we hit those cards on the 20th she'd have probably been terminated. So she resigned seven days before we knew what she had done.

Q. Did Ms. Williams -- oh, but she did resign? She wasn't terminated? While we're on that --

(Overlapping speakers.)

A. That's correct. She resigned.

BY MR. McCARL:

Q. And did Ms. Williams supervise anybody else?

A. No.

Q. Was there anyone else besides Brad Nichols at her same level of reporting?

A. No.
Q. Did anybody report to Mr. Nichols?
A. Yes.
So up until Meri came on board, Coco reported to Brad, so did Desiree, so did -- really about everybody in the company that was not a direct report of mine reported to Brad. He also signed contracts. He also did offer letters. I mean, he was an officer.
Q. Okay. And Coco reported to him before reporting to Meri?
A. Yes.
Q. And I thought -- I think you said -- and I understand in small companies sometimes titles are loose, and you mentioned that Coco wanted a specific title, and you accommodated that request.
But then I thought you said that Brad Nichols had a sort of parallel-sounding title of EVP of operations.
A. That's correct. EVP of operations. He was EVP, client care. Two different silos.
Q. But with Nichols, he supervised people and Ms. Williams did not?
A. That's true in that -- yeah. She -- at a certain point, we did have client care people.

had to defend her a lot.

And my position was that I believed that everything she was doing was in the best interest of the client, maybe not the best interest of the company. But I felt like her heart was in the right place so I backed her continually every time there was a problem with like Desiree not wanting to do this or Coco telling her what to do.

Q. Did anybody ever note or say to you, you know, it's incongruous or it doesn't make sense that Brad Nichols has an EVP title and Coco Williams has an EVP title, but Coco reports to Brad?

A. Oh, no, no. Coco didn't report -- Coco never reported -- she was a VP when she reported to Brad. By the time that we promoted her to EVP, Brad wasn't there anymore. So she was now -- she would have been reporting to Meri. So the time she reported to Brad, she was a VP.

Q. I must have misunderstood.

A. Sorry.

Q. Okay. Why don't we take a break in a just a couple minutes.

Going back to this license agreement

with Freeman Honda, it looks like they were on a month-to-month plan.

A. You would have to look down to the term; but, yeah, it says month there. So, yes, uh-huh. That's correct.

Q. It says here "Termination will take effect 30 days after receipt of the termination notice."

Do you see that?

A. Yes, I do.

Q. I thought you said it was automatic upon receipt of --

(Overlapping speakers.)

A. That's in our current contracts now. It's immediate. But it's -- as I said, this is an older version. So I wasn't aware that that was in here.

Q. So that change was made --

A. -- made immediate --

(Overlapping speakers.)

THE CERTIFIED STENOGRAPHER: I'm sorry. I need the answer.

BY MR. McCARL:

Q. My question was this change was made after -- this change to the standard licensing

agreement was made after Ms. Williams left?
A. No. We changed over to the new license agreement while she was still with us, but this was done, actually signed, right before she started.
Q. So was this the license agreement for Freeman Honda that was in effect throughout their time being your customer?
A. This would seem to say so. I haven't looked for subsequent ones, but I think that's it.
Q. Okay. And I believe that this was attached to your declaration in the opposing summary judgment motion.
A. I think so.
Q. So fair to say you probably -- you have no reason to believe that there was a later license agreement?
A. No. No, I don't.
Q. So the actual license agreement applicable to Freeman Honda says that termination occurs 30 days after receipt of termination notice, correct?
A. That is correct.
Q. And you said that although they said they had sent one earlier in January of 2022, you

Q. And that's been the case throughout the deposition today?
A. Yes. Uh-huh.
Q. Okay. So I think we're not going to have to use the full time today. So I think we're having a good discussion and we'll see if we can get out in time for us to have a full evening.
So I wanted to just briefly go back with respect to the software licensing agreement between Freeman Honda and T2, just to be clear.
Ms. Williams is not a party to that agreement, correct?
A. No. She is not.
Q. Okay. I actually need you to revisit that for a quick follow-up. So you mentioned before -- you alluded to a possible contract term requiring the -- the dealership to only use the log in for one person.
Did I get that right?
A. No. What we said is its limitation is that -- it's right there. I mean, you can see.
Software by unlimited number of in-house web browser users on a single instance of the software.
Q. But anybody in the -- anybody in the

organization can use it, not just Wyman King or Freeman Honda, correct?

A. It's not our intent. I mean, we -- we give -- and I don't know what else it says in here. I haven't looked further.

But when we give credentials, we expect those credentials to be used by the person they're issued to. But if it had been used by anybody in house, then we would not have seen an IP conflict and we would not have known there was a problem.

Q. What do you mean by "IP conflict"?

A. Okay. So the Internet protocol had a IP address. We're saying that if they were abiding by the contract, an in-house web browser means on-site, at the dealership. And so we would be seeing that log in coming from an IP address from the dealership that we were familiar with.

And IP addresses, you can take the IP address and you can do a "who is," and it will tell you where -- geographically, where it's coming from. And if you had a previous experience with that IP such as we -- such as Coco's IP, then we would know who it is.

So we would not have even considered

that there was a breach or a problem had -- and I would have no way of knowing if Coco was on-site. But because the IP address did not come from an in-house browser, that's what made us think we had a data breach; and that's what we responded to.

Q. So let me -- but just to -- I want to focus on the unlimited number of users first. So that seemed to contradict what you said earlier and I know you don't have these things memorized --

(Overlapping speakers.)

A. I don't -- sorry.

BY MR. McCARL:

Q. At some point you were talking about a changed version of the license agreement that -- that -- that occurred to sort of new customers after the events at issue in this lawsuit.

So not accusing you of anything, but I just want to clear it up that it says an unlimited number of users at the dealership can use the license. Correct?

A. Yes. We don't -- it's not a by-seat license. So as long you're an in-house and you're a employee or whatever at Freeman Honda, yes, you could have -- everyone in there could have it.

Q. So if Wyman King had a secretary, they could have the secretary log in to their account just as Ms. Williams did?

A. Yes.

Q. And it doesn't actually say on-site either. You've used the word "on-site" a number of times. Maybe that's from the new contract. This one says "in-house." Are you --

(Overlapping speakers.)

A. Sorry.

BY MR. McCARL:

Q. Are you equating those two terms?

A. I am.

Q. But I've paged through this and I don't see any definition of in-house as being on-site.

Do you have any information that can help me out on that point?

A. As being non-defined term, not a term of art, what would a reasonable person think in-house means. And I think it would be in-house. Not out of house.

Q. You interpret it as being -- you interpret it as being on the premises of the dealership?

A. I do.

Q. And have you done -- have you ever checked to see -- do you kind of run routine audits or any other checks to see whether the dealership is ever logging on from other locations than the dealership?
A. I don't know.
Q. You're not aware of any practice that T2 Modus has of checking on that?
A. I'm not aware -- or that it happens or doesn't.
Q. It may well happen routinely for all your know?
A. For all I know.
Q. Okay. That's all I have for that one.
MR. McCARL: Next, I'm going to introduce what I'm going to mark as Exhibit 4.
(Marked Exhibit Number 4.)
BY MR. McCARL:
Q. Okay. Do you recognize this document?
A. I do.
Q. What are we looking at?
A. It says it's an employment agreement between Coco and T2.
Q. So -- so I think we're on the same page

from the discovery responses, but Ms. Williams was a T2 employee from December 1st, 2019, until December 31st, 2020 -- or I'm sorry -- December 13th, 2021; is that correct?

A. Yes.

Q. And I believe it was also stated in discovery that this was -- this was the employment agreement that was in effect from the day she was hired until the day she left; is that correct?

A. Yes. Yes.

Q. Okay. And you see here where it says that her wages are $130,000 split up monthly?

A. Yes.

Q. But T2 didn't always pay that amount, did it?

A. Can you clarify?

Q. In the time frame where she was employed by T2, did it routinely make these $10,833.33 monthly salary payments to her?

A. There was an exception.

Q. What was the exception?

A. So in -- and I'm going to be loose on dates here because I don't remember exactly.

But somewhere around March, April range of 2020, due to COVID we had our

dealerships in the Northeast -- New York, New Jersey, sizeable amount of business -- were ordered to shut their showrooms during the first parts of COVID, and we lost, immediately, over $50,000 worth of monthly revenue. We called a meeting of the employees and said, "Look, we're going to have to make some changes. We would like to avoid any layoffs, and if people would voluntarily reduce their pay by 20 percent, then we will try to get that back as fast as we can since business warrants it. And we discussed it and everybody said, "Yeah, please do that, and let's try to avoid layoffs," because as I said, we're like a family.

So we reached out to ADP TotalSource, that's our PEO, and said, "Hey, this is what we want to do. How do we do that?"

And had extensive conversations. And this was -- when I say "we," it was Brad Nichols and ADP. And this was being handled by Brad. Other than just tell Brad go find out what we need to do, the employees want to do, that he talked to ADP and said, "Yeah, as long as you give them notification prior to the pay period that's going to be affected. That -- ADP sent out an e-mail

A. I don't recall that I did.
Q. Okay. So, to the best of your knowledge, everybody at T2 had a flat 20 percent salary reduction starting shortly after that meeting?
A. I believe that's correct.
Q. And you personally took a 20 percent salary cut?
A. No, I did not. I was already -- had -- my salary had -- had -- prior to that, was over $300- to 400,000 a year. I had dropped down to 15,000 a month. I withdrew all of my retirement out of my 401 to have many months where I did not take any salary at all. And so going into COVID, we had already amassed quite a bit of personal debt that we were having to service from not taking checks. So I did not personally reduce my salary.
Q. Okay. So it sounds like that also seemingly corrects the answer to the previous question, which was: It wasn't an across-the-board cut? And the answer is "no"?
A. Well, I said "employees," and I own the company, and I'm not an employee. So, yeah, in terms of employees, I believe it was across the board, yes.

BY MR. McCARL:
Q. You said you were going to try to make it up through bonuses?
A. We said -- we used the terminology that we would use best efforts. That when -- two things under best efforts. One is that, once the company was doing well, that we would try to return them to pay as soon as possible. We did before we were doing well. We restored them after, I believe, two months.
And then, of course, no one in the company has received any kind of a bonus since that period of time because the company has not been profitable.
Q. So despite the company's best efforts, no salary was, in fact, reimbursed?
A. No. No one's.
Q. T2 did take out a PPE loan, correct?
A. We did.
Q. Did that have any conditions relating to employee pay?
A. I don't know. I don't recall.
Q. Did Meri Glade have her salary cut?
A. I don't know and don't recall. She's taken several cuts, major cuts. So -- but I don't

Is that your testimony, that the whole team, the entire set of employees was there, and nobody -- nobody breathed a word of disagreement?

A. To the best of my knowledge, all employees were present. I can't remember exactly, but I believe that was the case. And I do not recall anyone voicing any kind of opinion or having a problem with it either during that meeting or in the subsequent days that followed prior to us making that pay change.

Q. At any point, did any employee contact you to say, "What's going on with the salary?"

A. No.

Q. Nobody ever said, "I miss my contractual salary. Can you restore it"?

A. No. Not to my recollection.

Q. Did you -- did you ever obtain a written agreement from Ms. Williams that she consented to a reduction of her contractual salary?

A. I did not.

Q. Did you ever receive one from any employee?

A. No. And they all had this same form of letter when they were hired.

Q. The same employment agreement?
A. Generally, yes.
Q. So you're saying that this agreement we see as Exhibit 4 is a standard agreement with terms changing as the salary, but not much else?
A. That's correct. A position and the salary would be but not much else. We considered it an offer of employment, and we sent that out before employment and had them sign off. And they signed that and they signed the confidentiality agreement. And then we did their onboarding paperwork with ADP, and then they started their position.
Q. When will you -- when Ms. Williams resigned on December 13th, 2020, did you at that time -- did T2 Modus at that time provide back pay for the previously missed salary payments?
MR. CRISS: Object to form.
You can answer if you understand his question.
A. I think what you're asking is -- no. No one had received any back pay or offer of back pay or anything at that time; neither her, nor any employee.
BY MR. McCARL:

she resided in California, and ADP kept up with those details. So I don't know.
Q. But you knew throughout the time she worked there that she was in California?
A. Yeah. I knew that's where her residence was, yes.
Q. Were there any other employees in California at any time during Ms. Williams' employment?
A. Yes. I think so.
Desiree also lived in California, I believe, at the time. And at the time, I think when we had that meeting, Dean from support was in California, as well as Regina. So, yeah, I think that's who we had out there.
Q. When you say "Desiree," is it Desiree Wons?
A. Yes, uh-huh.
Q. D-e-s-i-r-e-e W-o-n-s?
A. That's correct.
Q. How long has Rory Ellis been with the company?
A. I'm guessing here, but I would say about four years.
Q. Okay. So was he there throughout the

duration of Ms. Williams' employment?
A. Oh, yes.
Q. What's his role exactly?
A. He's a -- now he's a senior developer. He was a developer. It's not a whole lot of difference. But a developer, software developer.
Q. Maybe I'm just remembering, but I thought you said earlier that there were three developers. And I don't remember his name being on there, but maybe you did list it.
A. Rory Ellis, Joey Silverbears, and I consider our CTO to be a developer because he does -- he writes code constantly. So that's Jason Mathews.
Q. Okay. So he was one of the three?
A. Yes.
Q. And you said that they all have similar competence and can work up and down the TechStack?
A. They can.
Q. And you also noted before that at a meeting in January 2022, after Freeman Honda downloaded its data, you asked in the meeting to look into where the login came from; is that right?
A. No. During the meeting -- I had been

receiving prior to that calls from various dealers, and I was starting to get the picture of what was going on with Coco and our clients.

And so I threw out in the meeting, "Hey, can you guys" -- "and you guys" -- or "can you guys check and see if Coco has tried to log in to our system since she left?"

And that's when Rory said, "Yeah, I'll check." We kept going with the meeting. And he chimed back in a few minutes later going, "Yeah, she has." And then we talked about that.

Q. So this wasn't some sort of routine audit? You asked specifically about Coco Williams?

A. I did, because of what I was hearing from my dealers.

Q. He was able to gather within a few minutes, it sounds like during the meeting, that the log-in into Freeman Honda's account had come from Ms. Williams' IP address?

A. Yeah. So in asking the question has she attempted to log in -- but this is speculation but this is what most guys would do -- he would pull her IP address from her previous log-in and to do a search and look at -- has any -- the log-in

taking place after her departure. And the answer was "yes."

Q. After her departure but while Freeman Honda remained a customer?

A. Well, I think we're still in kind of dispute as to what their status was.

Q. Okay. So were there any other follow-up investigations done?

A. In terms of the -- no, no. No, I can't think of any.

Q. So is Rory a salaried employee?

A. He is.

Q. Did it cost T2 Modus any money to ask him during this meeting to look into this?

A. We don't have any nonexempt employees -- no one is on the clock -- and we never have.

Q. So it didn't?

A. So, no, it did not.

Q. Have you told me all of the different investigations that have occurred in connection with this login?

A. I think so. Yes. Uh-huh.

Q. So at no point -- T2 Modus did not at any point incur any costs investigating into it?

A. Other than as a CEO in a software company

every time a developer has to move some project aside to do anything, there's an incurred cost. Yes.

Q. Except that in this case he just had to turn away from the meeting for a few minutes to look into it, right?

A. That was the beginning. Then we had to -- once we determined what had happened, then we had to spend time coming up with the countermeasures, what are we going to do to make sure it doesn't happen again. So there was a significant amount of time spent in response to incident.

Q. But not in investigating who logged in to Freeman Honda's account?

A. No. We knew that. I mean, based on the IP address, we didn't have to investigate.

Q. So this other time that you're referring to was relating to how can we change our general security practices?

A. Yes.

Q. And --

(Overlapping speakers.)

A. To make sure -- go ahead.

BY MR. McCARL:

Q. You can finish.
A. To make sure that, based on this incident, that this could not happen again.
Q. Can you describe the changes that were implemented to make sure it didn't happen again?
A. Yes. So, first of all, I think primarily -- and maybe one thing I'm absolutely aware of, we went to dual-factor authentication. So if Wyman had tried to log in to the system, he would have received a challenge and he would have received a code sent to his phone.
Q. Any others?
A. Not that I could specifically state. I know that we went through -- Jason Mathews went through what he referred to as a pretty complete -- there's some testing software, penetration software. He told me he went through a pretty complete audit of our security and the fact that everything is with AWS, it is pretty tight. And so therefore the real vulnerability was someone with credentials, and we felt like the dual-factor would take care of that.
Q. Right. But it wouldn't have stopped the log in, in this case because Wyman King did have a license?

worked with the guy previously and -- and called him and said, "What's going on?" And he was very forthcoming that Coco had spent quite a bit of time. Of course, she's -- it's one of the stores she's very close to. Kind of did their work for them, which she wasn't supposed to. And said that she had kind of gone on and on about how poorly she was treated with the company and she just had to leave because we just weren't respecting her or, you know, respecting her talents and getting to use her talents and, basically, reached out to him and said, "You know, the company I've gone to work for can --" and we kept hearing the same verbiage over and over -- "can do exactly what T2 does but can do it for half the price." We heard that back from Serra Auto Group. We got that back from Bud Clary Auto Group. Anybody that would talk to us, but most of them would not.

Q. But you never heard that phrase come out of Ms. Williams' mouth yourself?

A. No. But I had two people that are on -- they're members of the company, worked with Coco back in the AutoWork days -- one being David Smith, the other one being John Repetto -- that she reached out to during January 2022 and told

them that she went to work for a company -- same verbiage: Jim does half the price. Same thing. And, again, with David, said "It's nothing you can do about it." So that's a whole lot of signal, but I never heard her say that directly to me.

Q. Or to anybody?

A. I wasn't present when she said that to anyone.

Q. Who are T2's competitors, in your mind?

A. In my mind, we don't have any because of the two things that are unique to us. One is government registration data and the second is the prediction scores that we put up that allow the dealer to triage. I don't know of anyone that does that.

The other space around us is data mining. So that would be AutoAlert and companies like them. And a lot of those guys put a behavioral prediction score in there. And I was -- with AutoAlert, I helped them develop it. This is really simple. Add this and this and this. There's no machine learning. So data mining companies we don't consider competitive. We consider that they would be better if they were using our data and then doing their math. But I

Q. Same day, March 31st, 2020, "Subject: Sample."
A. Yes.
Q. Can you take a minute and read that e-mail to refresh your memory?
A. Yeah, I did, and I -- one thing, I know this wasn't the final e-mail that went out. You should have that as well. I think that's --
Q. I don't think we --
(Overlapping speakers.)
BY MR. McCARL:
Q. I'm sorry.
I don't believe we do. So maybe you could have your counsel send it to us?
A. Yes. Yeah. Because it does not read exactly like this.
Q. Okay. Well, that was one of the questions that I had in mind, and I wanted to make sure we got that too.
A. Yeah, when we get to that -- sorry.
Q. So in the draft, though -- let's just talk about the draft since we have you here.
It says "Hello" -- and I assume this is supposed to be an employee name, where it says "XXXX."

actually do see you say -- you respond to say "I would change the one sentence to read: Once business bounces back, T2 will use its best efforts to make up any shortfall in compensation during this period through bonuses."
A. There you go. That sounds more like it.
Q. So the e-mail is probably the same e-mail with that one change?
A. Maybe. I mean, we have the actual records. No need to speculate.
Q. Soon as we get it --
A. Sure.
Q. -- we'll be able to do that.
Okay. So it's fair to say that with that change, this is the -- this e-mail reflects what you communicated to employees before the 20 percent salary cuts?
A. Yes, spirit of it. Uh-huh.
Q. Did you ever tell the employees that you personally were not taking a salary cut?
A. I did not. I also didn't inform them when I didn't take a check at all.
Q. And so when you say "reducing our salaries 20 percent across the board for all employees," you were exempting yourself?

A. Yes. I don't consider myself an employee.
Q. Who else don't you consider an employee at T2, if anybody?
A. My wife. She does accounting, and she is a contractor.
Q. And did she take the 20 percent pay cut?
A. She wasn't doing accounting at that time.
Q. She wasn't working at all for T2 at that time?
A. We had a different -- I think Shy was still onboard doing accounting. But, no, she didn't work at all for T2 during that period.
Q. Everybody else that worked at T2, that you recall, was an employee except for you?
A. Let me think for a minute. We may have had development contractors. Definitely anybody that e-mail went out to would have been considered an employee other than myself. We might not have sent it to Meri because I believe she was outside counsel. But, again, I don't know. I would have to check the record.
Q. I don't recall if you testified. Did Meri Glade take a 20 percent pay cut or not?
A. Well, I don't remember if she -- I

service appointments?

A. What it's doing is it's searching if it's set up that any of these lists have a condition on it that says it's a list, our campaign, and they have an open -- or they just opened an appointment or opened an RO, it detects that and then sets it up to be automatically executed through any number of systems.

If the dealer wanted it to come to them in the form of an e-mail, which none have, the ADF is actually an e-mail. So all we have to do is change the body of that e-mail and send it to a different inbox. But no one wants to do that. They want it in their CRM so they can record the notes and check on the response.

Q. Okay. And then let's go back to your first -- your first item. The first -- the other one you mentioned as -- that you testified to today but is not on this list, and that was teaching neural networks to sleep.

Before -- this is the one where -- where I noted, and I think you agreed that you were speaking metaphorically rather than using technical programming terms.

A. Yes, that's exactly right.

Q. I thought earlier you called it trimming neurons --

A. Yeah, yeah, yeah. That's what happens during sleep, you have neuron trimming. But, yeah, it's one and the same process, and essentially described all of that to Dr. Oliver. And to my best -- he said he implemented it, and he was amazed at the -- so he had applied that neural human concept to code. I don't know how he did it, but I know that he told me that after he did it, we saw much lower noise levels, the implementation of many more neural nets -- neurons within the net.

And -- yeah, so I have to believe that. But we've never -- we've never done anything other than -- you know, we use it, and we consider it inside Dr. Oliver's box. And to us it's a trade secret. I don't know that if you described that to someone and got them thinking about it if they could do it. I don't know. We just -- we don't talk about it.

Q. So -- but neural networks don't actually need to sleep, right?

A. Literally, they do not. But the problem, in terms of making noise, is that they -- they

will create a signal, and you don't -- at a certain point, you don't want that signal. You want that signal to stop so that you don't get background noise. So that's -- that's --

Q. You're talking --

A. -- literally, they don't sleep. You're correct.

Q. You're talking about audio noise -- I'm sorry. You're not talking about audio noise. You're talking about data -- what exactly do you mean by "noise"?

A. Yes, data noise. It's a -- essentially at any kind of a -- if something doesn't reach a threshold -- so let's say -- I always kind of explain this, if somebody wants to understand, like, how does a random forest work, how does a neural network work, they're all binary. They're on or off switches. And so you have to stack -- let's say, the threshold is five marbles, have to stack up behind the gate before the gate will open. So it's off until five marbles stack in behind it, and then it goes on.

So the problem is, we don't want that switch to stay on and continue to give an indication because it's another 1 or 0 that's

clogging up the works. It's not important right now. So, essentially, that's what I mean by "noise."

It's data noise where multiple nets are giving an indication binary that something's up, and it's really not that important. So it just creates a noise floor that can't pick out the good data from the bad.

Q. Everything that you're describing with respect to binaries and ons and offs and the training is all -- is all intrinsic to neural networks generally, not something that T2 invented. Isn't that right?

A. Wow. I don't know. I would say that probably Apple would disagree with you. Google would disagree with you. ChatGPT would disagree with you.

(Overlapping speakers.)

BY MR. McCARL:

Q. Would they tell me that T2 made it? What would they tell me?

A. Oh, no. They would tell you that what they're doing, yeah, is -- it's like saying the computer that we're on right now contains nothing but 0s and 1s. That's not proprietary. So,

therefore, none of the technology we're using right now and none of the things we're viewing or doing are proprietary just because it's made up of 0s and 1s.

Q. I understand that's not what you're saying.

But you're talking about the general process of training neural networks, which is not something T2 invented, correct?

A. The general concept of that, no. It's not.

Q. Which part of it did T2 invent?

A. The idea or the application of the idea that you should trim neurons so that once they've done their job, that they be quiet.

And to my knowledge -- I've not read any articles, and I read quite a bit on AI. And I've not seen anybody write anything or talk about it, and I still see that there are noise thresholds that people are having issues with. And so --

Q. And you've never seen --

(Overlapping speakers.)

Q. You've never seen the code implementing this innovation?

A. No. I've just seen the results.
Q. You asked Dr. Oliver to make it happen, and he made it happen somehow, and you're happy with the results. Is that right?
A. Yeah. Many months and many dollars later, yes.
Q. How do you know that he didn't just use publicly available neural network libraries to make this happen?
A. I don't care how he did it. I'm happy it worked. I don't know what it makes -- makes it up.
Q. So, to the best of your knowledge, he may well have used publicly available neural network technologies to make it?
A. I don't know, but sometimes you can take a lot of publicly available pieces and put them together in a fashion that's proprietary. So just because the parts are not proprietary doesn't mean the whole -- back to 0s and 1s in the software we're looking at right now.
Q. Right, so -- but -- but -- but you're -- you're -- but you can only speculate because you haven't seen the code, and you don't know the specific technological innovation that was put in

Q. Was it ever -- was this discovery ever published anywhere or written about?
A. That's why we call it a trade secret.
Q. Okay. You've mentioned Dr. Oliver a number of times in this -- in this deposition, but what's his full name?
A. I'm going to have to look it up. He's been gone for probably four years, plus. If I think about it -- you know, his -- you get to be my age, you lose those nouns, you know, those last names.
Q. Okay. Well, hopefully, you can get that to us. This -- this thing about trimming neurons and teaching networks to sleep you know about because you asked him to do it and then, to the best of your knowledge, he did it?
A. Yes.
Q. And -- but -- and you forgot to include it in this list, "T2 Intellectual Property"?
A. Yes. In my mind, it's not -- it's not -- everything I have in there is facing. It's either facing our business process or it's facing our dealer.
This is so deep in the works that I -- it didn't occur to me until I -- we were

but, yeah, they do.

Q. Have you built some for them or built it for T2's only?

A. We built it for T2 and then gave them a way to come get it because we couldn't post it to them or push it into their system.

So, yeah. We've had to build API endpoints and then publish API documentations and then work with their development team.

Because what they're doing is they're coming to get those lists or they're presenting a record for us to fully process by posting it, you know, to the API. And on a single record, we return that in about 700 milliseconds. We give back the full expansion process on that one record and pass it back to them.

So, yeah. That's what I'm talking about there.

Q. Okay. So of the two -- the two areas of IP you mentioned that aren't on this list, teaching networks to sleep and then logic behind recurring lists, did Colynda Williams download either of those things from T2 Modus' server?

A. No, she wouldn't have gotten to anything about the neural nets. But in terms of recurrent

lists, yeah, she could have gotten -- you know, she was in the system before the download. Didn't download anything, so don't know what she was doing or looking at or taking screenshots of or videoing. I have no idea.

Q. So, to the best of your knowledge, the answer is no?

A. To the best of my knowledge, I'm not sure. But I don't know positively that she did. On the --

Q. I'm talking --

(Overlapping speakers.)

BY MR. McCARL:

Q. I'm not talking about all time.

I'm talking about in your complaint, you referred to on January 6th, 2022, Freeman Honda and Colynda Williams logged in to Freeman Honda's T2 Modus portal and downloaded trade secrets.

Did they download either of those items?

A. No, I don't believe so.

Q. Did they download any item on this list?

A. They resulted -- yeah. So Number 1 is probably the most sensitive, and Number 2 because

they received the results from AMD inputs.
So, yes, I would say, given what was downloaded, if you asked me to take -- recreate these, I would be almost completely there, but training against that data.
Q. So you list -- so there's -- I -- there's -- there's quite a few bullet points on here. You acknowledge that she didn't download any except for the first two?
A. Stand by. (Examined exhibit.)
Yeah, based solely on the download, I would say that's right. Just the first two.
Q. Based on -- what do you mean, "based solely on download"? That's based on everything you've alleged in the complaint, right?
A. Well, because -- so I -- what I say, for instance, if you looked at the item that says "Proprietary campaign building platform." So if you were to go onto our site and you were to take screenshots and you were to do videos, and even the video that I provided to you, you would now see how that operates, and you'd see how that function works, and you'd see the logic behind that function.
So there are -- there are certain

things by operating the system that would not be included in the download. And especially if you were trying to record the information and pass that on to, say, for instance, AutoMiner.

Q. But that's all -- none of that is alleged in your complaint.

You're not alleging that on January 6th, 2022, Colynda Williams downloaded any of these things, other than the first two?

A. I agree with that statement.

Q. Can we -- let's talk about the first two. You -- you -- you -- let's start with Number 1. So you claim -- I believe is what you just said -- that she downloaded predictive machine learning which accurately predicts the 90-day period in which a customer will transact an automobile purchase.

Did she download that?

A. She downloaded the results of that. So she downloaded a file in which that had been performed and, therefore, had the answers and had the inputs. So she could reverse engineer that very easily.

And so your point, where you said that -- about the recurrent list, I never thought

to go back and look, but I will now. And if that list -- the high SRP list had been set to "recur," there would have been no reason for -- even for Wyman King to have her get into the system because it was automatically being produced. So I will go back and look at that. But, yeah, that's the -- that's the key to getting to that number.

Q. So a trained neural network is essentially a software function into which you can put new data and get new predictions. Is that fair to say?

A. That is a -- that is a mature neural network, yes.

Q. Right. And your -- you -- you would say that the neural network in T2's Python base layer is a mature neural network?

A. Yes, mature, learning and relearning and maturing more, yeah.

Q. Did -- did -- on January 6, 2022, or any other time alleged in your complaint, did Ms. Williams download the neural network?

A. You can't, so no.

Q. What do you mean, "you can't"?

A. Well, you would have to have access to -- into our source code and actually to our objects,

and then download those. And so her access was to the results from that system, which is what we do in search. So I --

(Overlapping speakers.)

BY MR. McCARL:

Q. So she didn't -- so she didn't download any source code, correct?

A. No, not to my knowledge, no.

Q. Did she download any algorithms? Correct?

A. Not to my knowledge, no.

Q. Did she download the -- what you're calling "the object," the computer file containing the training neural network data?

A. Not to my knowledge, no.

Q. The -- so she didn't actually download Bullet Point 1 or Bullet Point 2.

What she downloaded was the fruits of it, correct?

A. She downloaded the necessary elements to reverse engineer it.

Q. She downloaded a list of the dealership's customers that was made available for export on T2's server for that dealership, correct?

A. According to her statement, she dialed

into the system. She, at Wyman King's direction, downloaded this list.

Our problem with that is it ended up residing on her machine. She was working for AutoMiner, who had an interest in doing everything, as she stated, exactly as T2 does at half the price.

So by having this information -- and we don't know who saw it. We don't know -- we know it was out of our custody and control. We know it was uploaded to Conversica, which is a named company. It's a partner with AutoMiner.

So we know that occurred. We don't know who saw that. We don't know at this time who in PureCars has seen that information or saw that file.

So it's -- it's out there and we don't know who has it. We don't know who's viewing it. And it is the necessary elements to reverse engineer our most precious assets.

Q. But you have no evidence that any of those things that you just listed occurred because you said you don't know it?

A. I have no definitive information that that occurred at this time.

BY MR. McCARL:
Q. You acknowledged earlier that you don't have any evidence that it had been shown to anyone else, correct?
A. No definitive evidence, no.
THE CERTIFIED STENOGRAPHER: Could we take a break?
BY MR. McCARL:
Q. What's your nondefinitive evidence?
A. Penny asked for a break. Do you want to come back to that?
Q. I'd like you to answer.
A. Okay. Non -- well, nondefinitive, in evidence, I don't have something I can produce.
I can have -- looking upon the website of AutoMiner, and looking at our verbiage, looking at the press releases from PureCar, when -- at the national auto dealer convention, when they announced -- we saw almost verbatim verbiage of how we describe our product. Seeing the flow on AutoMiner website of the process.
So those are my nondefinitive. Could they have dreamt that up in a vacuum? I guess that's possible.
Q. You're talking about --

Until I have that smoking gun, then no. We're not going to run at something that we don't have all the facts.

Q. And did -- did your litigation risk analysis -- in your litigation risk analysis of whether to sue these parties -- Colynda Williams-Arowolo, who you sued, and then these other companies, large companies who you didn't sue -- did it factor in that Williams-Arowolo was a former mid-level employee who may not be able to afford good lawyers?

MR. CRISS: Object to form. Assumes facts not in evidence.

THE WITNESS: Answer?

MR. CRISS: If you understand the question, you can attempt to answer.

THE WITNESS: Yeah, I can try to answer it.

A. No. It was -- when we set about this, we felt like we were -- first of all, between a rock and a hard place because we didn't know if we had a data breach. No one would inform us whether or not we did, and the fact that the dealership didn't made us very concerned.

We thought that we possibly had a lot

of liability. We didn't know what that liability was. And whatever Coco was doing, we wanted her to stop. No one else was doing anything directly to us. She was the one calling our dealerships, telling them she did exactly what we were doing -- that's what it looked like. She was very, very active. What we were searching for in the very beginning of this suit is just "Stop."

MR. McCARL: Okay. We'll take a -- let's take a ten-minute break.

THE WITNESS: Thanks.

THE CERTIFIED STENOGRAPHER: We are off the record at 6:19 p.m.

(Recess taken from 6:19 p.m. to 6:35 p.m.)

THE CERTIFIED STENOGRAPHER: We are back on the record at 6:35 p.m.

BY MR. McCARL:

Q. Okay. Thank you, Mr. Roach. You understand you're still under oath?

A. I do.

Q. And did you speak with anyone other than your attorney during the break?

A. He won't let me out of his office, no.

Q. Wise attorney.

correct?
A. I would not -- no, I would not characterize that as central. I would characterize all three of them as being -- at least three counts that I read are all central. All of those led to us losing $120,000 a month in revenues and 600,000-dollar annual contracts.
So, no, I don't think the only thing in question here is the download. I think it's all of the other breaches of confidentiality and fiduciary duty.
Q. All right. And let's just take -- let's just talk about the download, then.
So the download, if I understand your testimony correctly, she didn't download any trade secrets. What she downloaded was data from which you could reverse engineer trade secrets, correct?
A. Yeah. You can't -- if you're trying -- trade secrets have a much broader definition than what you're going for there. But if you're defining it as strictly code, she didn't download any code. But, again, I believe trade secrets is a much broader definition than -- than "Did she download the code?"
Q. We -- we looked together at the CSV file

that she downloaded -- or redacted copy.
A. Yes.
Q. But, nevertheless, the same thing. That's the sum total of what she downloaded, correct?
A. To the best of my knowledge, yes.
Q. And it -- is that document itself a T2 trade secret?
A. It contains T2 trade secrets, I believe.
Q. But the identities of the customers are not a trade secret, correct, not one that belongs to T2?
THE CERTIFIED STENOGRAPHER: Please slow down.
A. The customers themselves, in terms of their name -- their name and the contact information associated with them is not the property of T2, no.
BY MR. McCARL:
Q. So what she downloaded is the one CSV file containing records of vehicle owners in plain text, correct?
A. We keep trying to simplify the characterization of what she downloaded, and I don't believe that's a fair characterization of

assume since -- if it didn't, then when we started the dealership up and it hadn't -- hadn't been through COVID and a chip shortage, it would get really crappy results at first.

So that's just my inference that it must learn. It must have a baseline or we would see radically different results than what we're seeing.

Q. Especially for dealerships that come on and they're -- they don't have much historical so the model can't learn very much from their data, those would be wildly inaccurate predictions.

Don't you think?

A. No. That's incorrect. History doesn't have very much to do with anything. We get dealerships that are what we call "green points." They have zero history.

And so we'll take and go procure information for them. There's a file out there called the auto file, and it comes from service. And we'll take customers that have been in the service department last three, four, five months -- you know, very, very recent -- expand that data out to what's in garage. We have their history in terms of their -- how they trade

on there and try it again. And so you can keep appending the moon phase -- whatever you want. Until finally it's lining up with what the dealership is actually seeing. So it makes a prediction. "These people buy in 90 days." We want the vast bulk of that to be spot on. There's going to be some false positives and false negatives. So, yeah, absolutely, you can do that.

Q. But what you're describing is -- is the train test split, correct?

A. That's one -- yeah, that's one term for it, yeah.

Q. And then you use the hold outset to -- to train -- to validate the model weights on --

A. Yes.

Q. And that's standard across neural networks generally; that's not something T2 invented. Right?

A. No, we did not invent that.

If somebody stole the key from me and ran to a locksmith and made a copy of it -- we didn't invent the key machine; but the fact that the key is there and somebody knows how to operate a key duplicating machine and to make a duplicate key, then they can now have what we had and then

the main key gets returned to me.
So that's the issue, is that, yes, anyone could -- once they have that initial -- and that's -- I guess, is our main point. Once you have the initial scores and the input files, you can build the initial neural nets and the initial machine learning and then begin to make it smarter through training.
Q. Okay. But the bottom line is that the models themselves are not downloaded. The code was not downloaded. Your complaint alleges that this particular list of people associated with Freeman Honda was downloaded and that trade secrets can be reversed engineered from the download, right?
A. Yes.
Q. Okay. Do you track who accesses the -- the dealership's T2 portal for each dealership?
A. We do. We have a log file.
Q. You have a log file. Is it ever audited, or does it just sit there like most log files?
A. Like most log files until there's an issue, then we'll go and look at it. But there's not -- there's not an audit process for us.
Q. All right. When you -- so after you

learned about the download that -- the Freeman Honda download on January 6th, 2022, you said you reached out, I believe, twice to Freeman Honda, correct?

A. We did. Our law firm, Munsch Hardt, generated two letters out to them, an initial saying, "Hey, this happened." A second went out to Dane Miner, the operating partner, certified, with more depth. "Hey, we think there may have been a breach. We need to know what you know about this."

We gave them all the details we can -- or could about it, and both times we got no response back from them whatsoever.

Q. Did you tell them cease and desist using this document, it's a trade secret owned by T2?

A. No. Because anything that prior to them no longer -- you know, whatever they downloaded out of our system or whatever ended up in their CRM or anytime during the course of when they were a customer of ours, we would not have a problem with whatever they retained. Our problem is it left the control and custody of Freeman and us and we don't know where it went and got --

(Overlapping speakers.)

BY MR. McCARL:
Q. How do you know it left the control and custody of Freeman?
A. Well, we know that it went -- it did not go to an in-house web browser in Freeman at their IP address.
Q. But you don't know one way or the other whether it was done at T2's request?
A. You mean Freeman's request. I have no idea. It doesn't, to us, matter whether or not it was requested or not requested. That was an unauthorized access and an unauthorized download.
Q. But as I -- okay.
But I think what -- I think we -- if I understand correctly what you were saying, you didn't -- you wouldn't have a problem with it because they were at that time a licensed customer of T2. So, therefore, they had the right to do exactly what they did, which was log in and hit "download"?
MR. CRISS: Object to the form of the question.
A. So what I would say about that is that had Wyman, with his credentials from an in-house browser, done exactly what Coco did, downloaded

right?
A. Right.
Q. And I'm asking -- but you don't actually have any evidence one way or the other as to whether Ms. Williams or anyone else showed the download to anybody?
A. It was an unauthorized access out of our system and download of information. Period.
Q. Just answer the question. It's a simple question.
A. We have the evidence that that occurred. As far as what she did after the fact, we don't have anything definitive at this point.
Q. So no evidence that -- that --
So my question was you have no evidence that she shared the list with anybody after downloading it?
A. We don't know that, and we don't know that it didn't happen.
Q. Okay.
A. It would have been -- it would have been a compelling reason to share it, based on her job description of vice president of growth and strategy, working for a company that she's helped being put into our business. It would have been

compelling since she's being compensated.
Q. Did -- when -- when Ms. Williams worked for T2, was -- did T2 supply her a computer or did she use her own personal device?
A. No, she used her own personal device.
Q. Is that generally how it works with T2's remote employees?
A. Unless you're a developer. And then we want you on our equipment.
Q. Why?
A. Well, because we can control -- control -- it's a development environment. We can control the environment, what other particular things are running on there that could interfere.
So they -- anything they want to do that's not development, they should do it on a different machine. So they must -- you know, we require them to use ours. We require them not to have any other software installed so it won't interfere with development.
Q. Okay. So it's -- that sounds like a pragmatic reason.
Is there -- is there a sig- -- any different level of security related to why developers have access -- have their own computers

from T2?
A. No. No. Not specifically, no.
Q. Okay. Now, we -- I believe we said earlier that -- that what would have happened if Ms. Williams downloaded this or anybody downloaded this same list from a dealer's T2 portal is that a CSV file would appear in their download folder; is that right?
A. That's correct, on the local machine.
Q. Would it be -- would that file be password protected?
A. Not on their local machine.
Q. Would it be --
(Overlapping speakers.)
A. Not on their local machine, no.
BY MR. McCARL:
Q. Would it be encrypted?
A. Not on their local machine, no.
Q. Did the download itself, the January 6th download, impair the integrity of any other T2 data?
A. No. I don't -- I don't know how it would corrupt any of our data.
Q. What about any other T2 program?
A. No. It wouldn't have interfered with the

program.
Q. It didn't interfere with any aspects of T2's business?
A. Oh, yeah, it did.
Q. No. I'm saying the download itself, the active download, did that itself cause harm?
A. From a technical standpoint, that isolated act at that time did not.
Q. And that's why you said that if Wyman Honda had done it personally it wouldn't be a problem because he was a licensed --
A. That's right. Technically, it would have been the same -- gone in and downloaded a file, yes.
Q. Okay. In -- in T2's request for admission responses, Request For Admission No. 6 asked, admit that the data in the January 6th, 2022, download, it was downloaded from an online portal that T2 made available to Freeman Honda.
I think, based on what we've talked about all day long, that is how -- that is how that download occurred, correct?
A. From an online portal available to a T2 -- available to Freeman Honda?
Q. Yes.

definition in what was downloaded.
Q. So that's the basis on which it was denied?
A. Yes. It's too narrow --
(Overlapping speakers.)
BY MR. McCARL:
Q. Okay. There's no claim that people listed in that file are T2's customers, correct?
A. No. We're not making that claim, but customers are prospective is where it's too narrow.
Q. Number 15. "Admit that Freeman Honda was authorized to access all the data you allege was downloaded on January 6th."
And you said, "Deny."
A. That's an error. That -- admit that it was authorized to access all the data you -- so, again, I said that there was some contention, some confusion, about when did they submit their cancellation. And if he said it was effective January 1st, we would've thought he submitted it Jan- -- December 1st. We've never found it. So I could see why on January 6th, depending on what position you take on when was his cancellation final, that would either be admit or deny. So

"Admit that data in the January 6th download consisted of one CSV file containing information stored in plain text."

Couple minutes ago, the answer was, yeah, that's what the download was. Here it's "Deny."

A. Okay. What we're saying there is that our downloads are never in plain text, but it is true that it was a CSV file. So if you want to correct that "admit," that probably got stuck on the "plain text."

Q. CSV files are plain text files, right?

A. I don't know. I mean, "plain text" means something different to me because I work in binary; but CSV is clear, and I just missed that.

Q. But you said -- you -- but you've programmed before. So you understand that there are certain things as binary files and then there are text files?

A. I do. I understand. But what I'm saying is I missed the CSV and focused on the plain text.

Q. I'm not worried about the response.

(Overlapping speakers.)

THE CERTIFIED STENOGRAPHER: One at a time. And I need y'all to slow down,

please.

BY MR. McCARL:

Q. Based on your program analogy, it sounds like you do understand what the question is asking. Is a CSV a binary file or is it a text file?

A. It's a text file. So I would change this answer to "admit." Yes.

Q. We also had denial on this one that I asked you a few minutes ago as well.

"Admit that the data in the download was unencrypted."

A. That's an error. Everything that leaves our system is encrypted except for a download to a local machine. So that's an error. That should say "admit."

Q. And it would be pretty inconvenient for the dealership if -- if the export didn't produce something that was useful to them?

A. No doubt that that's why we don't restrict that on the download to the local machine, but everything else that leaves the system is encrypted.

Q. When did you turn -- when did T2 Modus turn off Freeman Honda's access to portal?

for former customers -- or for these -- you've alleged that you believe that Ms. Williams resigned from T2's employment and then convinced various customers of T2 to leave and go to a competitor. And you've attributed to that various numbers of losses. At one point -- I do have in my notes here -- you said $600,000 a month in revenue; another time you said it was $2 million of losses.

Which is it and how are you coming up with the numbers?

A. I'll help you with your math. So 120,000 per month in existing revenue that vanished. A 600,000 annual contract with Coughlin that she interfered with. So 1. -- so 120 times 12, it's a million and a half. Add the 600, that's how we get to the 2 million plus God knows what kind of disruption this past year with all of the legal and what we spent there.

Q. So you're including your legal fees as part of your damages?

A. I don't know. I have an attorney that makes that determination. But I'm not in those numbers.

Q. Yeah, in this annual contract with

Coughlin, did they -- had they signed it or was it your hope that they would sign it?

A. We have a verbal -- verbal agreement, "Yep, that works. Let's do it." Send over the contracts, we'll sign it, and they went dark.

(Overlapping speakers.)

THE CERTIFIED STENOGRAPHER: Excuse me. One at a time, please.

BY MR. McCARL:

Q. It sounds like the answer is no, they had not signed the contract.

A. They had not inked the contract, but they had verbally committed in front of witnesses, yeah.

Q. They decided to go a different direction?

A. They went dark.

Q. Give me five minutes to confer with my colleagues and make sure we've gotten everything that needs to be asked, and then we'll wrap it up. Let's come back at 5:40.

THE CERTIFIED STENOGRAPHER: We are off the record at 7:33 p.m.

(Recess taken from to 7:33 p.m. to 7:44 p.m.)

THE CERTIFIED STENOGRAPHER: We are

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| T2 MODUS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| COLYNDA WILLIAMS-AROWOLO, | § | |
| | § | |
| Defendant. | § | |
| ______________________ | § | CIVIL ACTION |
| | § | NO. 4:22-cv-263 |
| COLYNDA WILLIAMS-AROWOLO, | § | |
| | § | |
| Counterclaimant, | § | |
| | § | |
| V. | § | |
| | § | |
| T2 MODUS, LLC and JIM ROACH, | § | |
| | § | |
| | § | |
| Counterdefendants. | § | |

REMOTE ORAL VIDEOCONFERENCE DEPOSITION OF

JAMES A. ROACH

INDIVIDUAL CAPACITY AND AS CORPORATE REPRESENTATIVE

OF

T2 MODUS, LLC

TUESDAY, MAY 16, 2023

Volume 1 of 1

(REPORTED REMOTELY)

CERTIFIED STENOGRAPHER'S CERTIFICATION

I, Penny L. Pabitzky, RPR, residing in

Nederland, Texas, do hereby certify that the foregoing proceedings were reported by me, a certified machine shorthand reporter, and that the foregoing transcript constitutes a full, true, and correct transcription of my stenographic notes, to the best of my ability and hereby certify to the following:

That the witness, JAMES A. ROACH, located in Dallas, Texas, was duly sworn by me and that the transcript of the REMOTE ORAL VIDEOCONFERENCE DEPOSITION is a true record of the testimony given by the witness to the best of my ability;

That the original deposition was delivered to RYAN McCARL, custodial attorney;

That a copy of this certificate was served on all parties and/or the witness shown herein on ____________________________.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was not requested by the deponent or a party before the completion of the deposition.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR PLAINTIFF AND COUNTERDEFENDANT T2 MODUS, LLC AND COUNTERDEFENDANT JIM ROACH:
Terry D. Criss, Esquire
ATTORNEY AND COUNSELOR AT LAW
3010 LBJ Freeway
Suite 1200
Dallas, Texas 75234
972-919-6150
tcriss@terrycrisslaw.com

FOR DEFENDANT DEFENDANT AND COUNTERCLAIM PLAINTIFF COLYNDA WILLIAMS-AROWOLO:
Ryan McCarl, Esquire
RUSHING MCCARL LLP
929 McCarthy Ct.
El Segundo, California 90245

[redacted]

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 26th day of June, 2023.

________________________________
Penny L. Pabitzky, RPR
NCRA - Expires 09-30-24
As An Independent Contractor For:
California Deposition Reporters
448 East Foothill Boulevard
Suite 101
San Dimas, California 91773
800-242-1996

Job Number 225924

California Deposition Reporters, Inc.

NAME OF CASE: T2 Modus, LLC. vs Colynda Williams-Arowolo
DATE OF DEPOSITION: 05/16/2023
NAME OF WITNESS: Jim Roach
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________
Page _____ Line ______ Reason ______
From ____________________ to ____________________

_______________________